IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 11, 2008

Charles R. Fulbruge III
Clerk

No. 07-30813

TONY BURBANK

Petitioner-Appellee

v.

N. BURL CAIN,
WARDEN, LOUISIANA STATE PENITENTIARY

Respondent-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES, Chief Judge, and DAVIS and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Respondent-Appellant N. Burl Cain ("State") appeals from a decision of the District Court granting habeas relief to Petitioner-Appellee Tony Burbank ("Burbank"). A jury convicted Burbank of two counts of murder; he was sentenced to life on each count. The Louisiana Supreme Court found two constitutional errors at trial and remanded. On remand, the Louisiana Court of Appeal held the errors were harmless and affirmed Burbank's conviction and sentence. The Louisiana Supreme Court denied certiorari. On federal habeas, the District Court disagreed with Louisiana's courts and granted habeas relief. We agree with the District Court and AFFIRM its grant of habeas relief.

I

Larry Welch ("Welch"), Jeffrey Jackson ("Jackson"), Paula Hess ("Hess") and Cassandra Scott ("Scott") spent the Saturday evening of January 19, 1997 at Welch's house drinking beer, smoking marijuana, and smoking crack cocaine. Around midnight, Welch and Jackson left the home to pick up food for the group. Their intended mode of transportation was a stolen car parked outside the home. While Welch and Jackson were attempting to push-start the stolen car, a gunman appeared and shot each man five times with a nine-millimeter handgun. Both men were killed.

After the shooting stopped, Hess and Scott exited the home. Scott went to the body of Welch, her lover, and removed the cash from his pockets. Neither Scott nor Hess called for an ambulance or alerted the police. The police arrived on the scene shortly after midnight and took statements from both women. According to the detective on the scene ("Hoobler"), police transported Scott to the station where she provided a formal statement, which stated that she was looking out the front window of the house when the shooting occurred and saw the shooter. Scott later identified Burbank (whom she knew as "Dog Boy") from a photographic line-up,[1] signing and dating the back of Burbank's police

---

[1] Detective Hoobler testified:

> Q: . . . I'm going to show you . . . State's Exhibit #29 and ask you to identify it?
> A: . . . it's an evidence envelope and inside are six color photographs of Black male juveniles.
> Q: And from those photographs was Miss Scott able to make a positive identification?
> A: Yes, sir, she did.
> Q: And who did she identify?
> A: She identifies photograph #4 out of lineup which is Tony Burbank or Tony Stone, Jr. or as his street name is "Dog Boy".
> Q: As a crime detective did she supply you with the street name?
> A: Yeah, she only supplied with the nickname of "Dog Boy" nothing else.

photograph on January 21, 1997, two days after the murder.[2] Hess, however, never identified Burbank.[3]

Detectives later arrested Burbank at his house. While searching his house, detectives recovered a forty-caliber semi-automatic pistol, an ammunition magazine, eleven forty-caliber rounds, and one nine-millimeter round. Detectives did not, however, recover any physical evidence linking Burbank to the killings of Welch and Jackson. In fact, authorities never found any physical evidence linking Burbank to the killings.

Because there was no physical evidence linking Burbank to the crime and because no other witness had identified him, the State relied heavily on Scott's trial testimony identifying Burbank as the killer.[4] At trial, after identifying "Dog Boy" as the killer, Scott identified Burbank as the man she knew as "Dog Boy."[5] During the State's direct examination, it elicited testimony from Scott

---

[2] At trial, Scott re-affirmed both her statement and her photographic identification.

[3] Hess testified:

> Q:      . . . you've never identified Tony Burbank as being the killer, have you?
> A:      No, I haven't.

[4] Scott testified:

> Q:      What happened later on that night?
> A:      Well I got hungry and at that particular time of night only place that's open is Church's. So me, Welch we got our money together for them to go to Church's him and Jeffrey. Him and Jeffrey left out the door. They walked to the corner. Larry walked back gave me a kiss. By the time I shut the door and returned back to the sofa I had – I heard fire shots, shots being fired. I then jumped on the floor. Then after a pause I got up and I looked out the window. And there I saw it was "Dog Boy" who shot em, I saw him with the gun in his hand.

[5] Scott testified:

> Q:      Do you see "Dog Boy" in Court?
> A:      Yes, I do.
> Q:      Where is he?
> A:      He's sitting over here (indicating) [to Burbank] . . .

that cast doubt on her credibility, including that she: had been drinking and doing drugs on the day of the killings but was not high at the time of the incident; was incarcerated at the time of Burbank's trial;[6] had three prior convictions;[7] and had considered falsely testifying that she could not identify Burbank as the shooter (indeed signing a statement to that effect) in exchange for assistance from a private investigator ("Smith") who was working for Burbank's defense. Scott also testified that the assistant district attorney trying the Burbank case had not promised her anything in exchange for her testimony.[8]

On cross-examination, the defense focused its efforts on impeaching Scott's credibility. Scott again admitted that she had been drinking beer, smoking marijuana, and smoking crack on the day of the crime. Scott also admitted

---

[6] Scott testified:

> Q:   Where have you been for the past twenty-two months?
> A:   Twenty-three months and a half I've been incarcerated.

[7] Scott testified:

> Q:   You have convictions, do you not?
> A:   Yes, I do.
> Q:   What are your convictions for?
> A:   Crime against nature.
> Q:   How many times have you been convicted?
> A:   Three.

[8] Scott testified:

> Q:   Have I offered you anything –
> A:   No, you haven't.
> Q:   – for your testimony?
> A:   No, you haven't.
> Q:   Have I ever talked to you about me being able to give you a get out of jail free card?
> A:   No.
> Q:   Have I ever told you that I hold the proverbial key to the jail?
> A:   No.
> Q:   Because who handles your case?
> A:   Judge Elloie.

again that she had been willing to change her testimony in exchange for assistance from Burbank's investigator. In addition, the defense established that Scott had been released from jail following another arrest upon testifying before Burbank's grand jury.[9] Although the trial judge did not allow Scott to testify concerning the nature of her pending charges, the defense did establish that she was facing at least five years in prison and that she was a fourth offender.[10] The defense also established that Scott's trial had been continued twenty-two times, was to begin the day after her testimony in Burbank's trial, and that Scott believed that she would plead guilty and be sentenced to thirty

---

[9] Scott testified:

| | |
|---|---|
| Q: | You stayed in jail that time for what three weeks? |
| A: | Give or take. |
| Q: | And the DA's came to you, right? |
| A: | One DA. |
| Q: | Tall, thin White guy? |
| A: | Yes. |
| Q: | And he says, look if you'll tell – if you're willing to come tell the Grand Jury we'll let you out, right? |
| A: | He didn't say it like that. |
| Q: | How did he say it? |
| A: | He asked me was I willing to go before the Grand Jury and testify once I get out. |
| Q: | And when you said, yes, you were released, right? |
| A: | I went back to court. |
| Q: | And when you said, yes, essentially you were released, right? |
| A: | If you want to say it that way. |

[10] Scott testified:

| | |
|---|---|
| Q: | You're facing . . . at least five years on the bottom line charge, right? |
| A: | I guess. |
| Q: | And the District Attorney asked about your prior arrests or convictions? |
| A: | I have three prior convictions. |
| Q: | Three? |
| A: | Three. |
| Q: | That makes you a fourth Offender, doesn't it? |
| A: | Yes, it does. |

months imprisonment.[11] However, when defense counsel asked Scott whether she had "completed a plea agreement over a year ago to get one year and get out," the trial judge sustained the State's relevancy objection and would not allow Scott to answer the question.[12] Finally, the defense suggested that Scott faced "twenty to life" if she did not identify Burbank as the killer. Scott, however, denied it.[13]

Following the State's case-in-chief but before the defense put on its case, the defense proffered testimony of Scott's former attorney ("Moore") in camera.

---

[11] Scott testified:

> Q: Now your case is set for tomorrow morning, right?
> A: Yes, it is.
> Q: You expect to pled guilty, don't you?
> A: Yes.
> Q: Yes, right?
> A: Yes.
> Q: Your case has been continued twenty-two times, hasn't it . . . ?
> A: Yes, it has.
> Q: If you're planning on pleading guilty and the twenty-two times over the last two years, why didn't you just pled guilty and get that over with?
> A: To enlighten you. Before hand I was going to plea guilty and accept thirty months but then I'm involved with another case, another Trial and they kept setting me back it wasn't my doing.

[12] Scott testified:

> Q: In fact you've completed a plea agreement over a year ago to get one year and get out, didn't you?
> St.: Objection to relevance again, Judge.
> Ct.: I would sustain that.

[13] Scott testified:

> Q: If you come in front of this Jury you know don't you that if you come in front of this Jury and ever admit like you told those people on the street that you made a mistake in identifying Tony Burbank you know you're going back there for twenty to life, don't you?
> A: No, I don't.

6

Moore testified that he understood that Scott had reached a plea agreement[14] with the State on her pending cocaine possession charge whereby the State agreed not to Quad-Bill her (which would have resulted in a sentence of twenty to life) and that Scott instead would serve only one year on the charge.[15]

The defense then presented its case, emphasizing Scott's lack of credibility. Smith testified that he visited Scott while she was incarcerated, informed her that he was an investigator working for Burbank, and without any inducement from him, Scott told Smith that Burbank was not at the scene of the killings. The defense also offered the testimony of Eugene Jarrow ("Jarrow"). Although

---

[14] The defense proffered Scott's purported plea agreement in camera, but it was not admitted into evidence at trial.

[15] Moore testified:

Q:  And did you have an occasion to represent one Cassandra Scott . . . ?
A:  Yes, sir. . . .
Q:  You discussed the case with Miss Scott?
A:  Yes.
Q:  Which case was that?
A:  Possession of cocaine.
Q:  And the penalty Miss Scott is facing is . . .
A:  The DA intended to Multi-Bill her. She was a triple offender, and she would get forty (40) months to ten (10) years if I'm not mistake. And the DA thinks this would make her a Quad-Bill which would be twenty (20) years to life.
Q:  Without parole?
A:  Yes.
Q:  Have you informed her of this?
A:  Yes, I have.
Q:  Has there been any offer to the best of your knowledge for the lesser penalty?
A:  Oh, from my understanding and from taking over the file, there was a plea agreement for one year in the Department of Corrections.
***
Q:  No Multiple Bill?
A:  No Multiple Bill. Just one year concurrent with any other sentences she might be serving.
***
Q:  It is dated 3/25/99. . . . Did you ever follow up any of that?
A:  That's "not," official, Judge. Usually the Judge will change different things in the plea agreement.

7

Scott previously had testified that she did not know Jarrow,[16] he testified that he had known Scott for about five years and that she smoked crack. When Jarrow began to testify about a conversation he had with Scott in which she allegedly told him that she had misidentified Burbank as the shooter, the judge stopped him.[17] The defense then sought to offer testimony from Camille Smith ("Camille"), which likely would have alleged that Scott admitted to Camille that

---

[16] Scott testified:

> Q:      . . . you had made a mistake in [Burbank's] identification, didn't you?
> A:      No.
> Q:      Well you told that to Eugene Jarrow, didn't you?
> A:      I don't know a Eugene Jared (spelled phonetically).

[17] Jarrow testified:

> Q:      Whether or not he ever had conversation to Cassandra Scott relative to Dogboy or Tony Burbank.
> St.:    Objection to relevance.
> Ct.:    No can answer whether or not he had a conversation.
> A:      Yes, sir.
> Q:      . . . tell the members of the Jury how that conversation came about?
> St.:    Objection to relevance.
> Ct.:    No he is going to say how it came about.
> A:      I can say it?
> Ct.:    How the conversation came about.
> A:      . . . Cassandra Scott had came over there to buy some crack and I was sitting down. I asked her about the incident with Tony Burbank and she told me.
> Ct.:    No, not at that point, at that point. That what she told you then we're not going to answer that, we're not going to get into that.
> A:      Alright.
> Df.:    Your Honor, are you –
> Ct.:    Yes, I am. Whatever you question is on that, yes I am.
> Df.:    Well maybe –
> Ct.:    We're not getting into what he told her and what she told him.
> Df.:    No, she's denied saying it -- no, we're trying to show that she did say it through a witness. The Jury has to make that decision, not the Court, Your Honor.
> Ct.:    Well the Court is making this decision that he's not going to talk about that.
> Df.:    So I can't impeach Cassandra Scott –
> Ct.:    The Court has made it's decision already on that.
> Df.:    Thank you, Your Honor, thank you.

she had misidentified Burbank as the shooter,[18] but Camille did not appear. The judge then denied the defense's request for a recess to locate Camille, and, after confirming that the defense had not subpoenaed her, ordered the next witness. Because the defense had none, it rested.

The jury convicted Burbank on two counts of murder; he was sentenced to life in prison on each count. His conviction was affirmed on appeal, but the Louisiana Court of Appeal remanded for re-sentencing. See State v. Burbank, 811 So.2d 1112, 1123 (La. App. 4th Cir. 2002). The Louisiana Supreme Court granted Burbank's petition for a writ certiorari and found two Sixth Amendment confrontation clause violations during trial, namely that the trial court erred (1) "by restricting defense cross-examination of the state's principal witness, Cassandra Scott, with regard to whether she had 'completed a plea agreement over a year ago to get one year and get out' of jail on her own pending criminal charges;" and (2) "by precluding the defense from presenting extrinsic evidence of a prior inconsistent statement made by Scott to Eugene Jarrow that she had falsely accused the defendant of killing the victim." State v. Burbank, 872 So.2d 1049, 1050 (La. 2004). In light of these constitutional errors, the Louisiana Supreme Court reversed in part and remanded for a determination of whether these errors were harmless under the standard set forth in Chapman v. California, 386 U.S. 18, 23-24 (holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"). See id. at 24. On remand, the Louisiana Court of Appeal held the errors were harmless beyond a reasonable doubt and

---

[18] Scott testified:

> Q:    You told that to Camille Smith [that you had misidentified Burbank], didn't you?
> A:    Who is Camille Smith?
> Q:    You don't know Camille Smith?
> A:    That names seems familiar Camille, I can't put a face with the name.

re-affirmed the conviction and sentence. See State v. Burbank, 893 So.2d 109, 113-14 (La. App. 4th Cir. 2004). The Louisiana Supreme Court denied certiorari. See State v. Burbank, 917 So.2d 1082 (La. 2005).

Finally, Burbank filed a petition for a writ of habeas corpus with the Eastern District of Louisiana pursuant to 28 U.S.C. § 2254, seeking habeas relief based on the two constitutional errors that the Louisiana Supreme Court found. The Eastern District granted habeas relief finding that "the two constitutional errors found by the Louisiana Supreme Court directly infringed upon petitioner's right to challenge the only material testimony the state provided allegedly connecting him to the crime" and therefore were not harmless. Burbank v. Cain, No. 06-2121, 2007 WL 2480319, *11 (E.D. La. Aug. 29, 2007). The State appeals.

II

This appeal raises two questions: first, whether the District Court erred in holding that it was not harmless error when the state trial court unconstitutionally restricted the defense's cross-examination of the State's principal witness, Scott, regarding whether she had reached a plea agreement with the State concerning the criminal charges then pending against her; and second, whether the District Court erred in holding that it was not harmless error when the state trial court unconstitutionally precluded Jarrow from testifying that Scott told him she had misidentified Burbank as the man who killed Welch and Jackson.[19] We need not address the second question because we agree with the District Court's resolution of the first question: it was not harmless error when the state trial court unconstitutionally restricted the defense's cross-examination of Scott. Accordingly, on the basis of the first question alone, we AFFIRM the grant of habeas relief.

A

---

[19] The only question before us is whether these two constitutional violations were harmless error; the parties do not dispute whether two constitutional violations occurred.

On appeal of a District Court decision granting habeas relief, we review the District Court's findings of fact under the clear error standard and its conclusions of law de novo, applying the same standard of review to the state court's decision as did the District Court. Summers v. Dretke, 431 F.3d 861, 868 (5th Cir. 2005) (quotations omitted). Although the District Court set forth certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"), as the governing standard of review, it actually applied the standard of review that the Supreme Court set forth in Brecht v. Abrahamson, 507 U.S. 619, 638 (1993), which governs federal habeas review of constitutional errors that occur during a state trial. See, e.g., Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007); Horn v. Quarterman, 508 F.3d 306, 322 n.24 (5th Cir. 2007); Kittleson v. Dretke, 426 F.3d 306, 319-20 (5th Cir. 2005). Indeed, the Supreme Court recently explained that the Brecht standard subsumes the standards announced in AEDPA because the purpose of AEDPA is to "limit[] rather than expand[] habeas relief," and Brecht is the more stringent standard. Fry, 127 S. Ct. at 2326-27; Hughes v. Quarterman, No. 04-70022, 2008 WL 2300252, at *8 ( 5th Cir. 2008).

Assuming that a state trial court has committed a constitutional error during trial, we will find that the error is not harmless under Brecht, only if the petitioner shows that the error resulted in "actual prejudice" meaning that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." Fry, 127 S. Ct. at 2327, 2325; see Barrientes v. Johnson, 221 F.3d 741, 756 (5th Cir. 2000). If we are in "virtual equipoise as to the harmlessness of the error under the Brecht standard" we will treat the error as if it affected the verdict. See Fry, 127 S.Ct. at 2328 n. 3 (quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995)); Tucker v. Johnson, 242 F.3d 617, 629 (5th Cir. 2001) (quoting Corwin v. Johnson, 150 F.3d 467, 500 (5th Cir. 1998)).

B

The District Court granted habeas relief under Brecht, "in light of the fact that testimony of the sole material witness able to connect [Burbank] to the crime, Ms. Scott, was the subject of constitutional error found by the Louisiana Supreme Court and th[is] undue restriction of the defense's inquiry into the plea agreement prevented [Burbank] from demonstrating her bias and self-interest."

The State contends that the District Court erred because other testimony provided sufficient facts about Scott's pending criminal charges, the State's leverage over her, and her possible motivation to testify favorably for the State to allow the jury to weigh her credibility. In any event, the State points out that the one-year plea agreement in question never was finalized and that Scott ultimately pled not guilty and was acquitted.

Burbank counters that these facts notwithstanding, the jury never was informed through Scott's testimony that her previous attorney, Moore, informed her that she faced twenty-to-life as a fourth offender if the State Quad-Billed her or that Moore had discussed with the State the possibility of Scott receiving a one-year sentence with no Quad-Bill, seemingly in exchange for her testimony against Burbank, which was memorialized in a proposed plea agreement. Whether the plea agreement was finalized and whether Scott ultimately pleaded guilty, according to Burbank, is irrelevant.

The Confrontation Clause guarantees a criminal defendant the right to cross-examine the witnesses against him. See Davis v. Alaska, 415 U.S. 308, 316-17 (1974). Exposing the motivation of a witness "in testifying is a proper and important function of the constitutionally protected right of cross-examination." See id. at 316. Indeed, it "is axiomatic that defense counsel should be permitted to expose to the jury facts relative to [the] possible motivation" of a witness, like Scott, "to testify favorably for the prosecution."

Wilkerson v. Cain, 233 F.3d 886, 890 (5th Cir. 2000).[20] And in a case like this one, where the witness in question, Scott, "is critical to the prosecution's case," we have recognized that the "right to cross-examination is particularly important." United States v. Jimenez, 464 F.3d 555, 559 (5th Cir. 2006) (quotations omitted); see also Wilkerson, 233 F.3d at 891.

The right to cross-examination, however, is not unlimited. See Jimenez, 464 F.3d at 559 (citations omitted). In analyzing a violation of the Confrontation Clause we look primarily at the specific testimony omitted, not the weight of the evidence notwithstanding the omitted testimony, see Jimenez, 464 F.3d at 563, and ask whether the trial court's erroneous decision to disallow such testimony had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht, 507 U.S. at 623. Under this standard, "a petitioner may obtain habeas relief only if there is 'more than a mere reasonable possibility that [the error] contributed to the verdict.'" Wilkerson, 233 F.3d at 892 (quoting Woods v. Johnson, 75 F.3d 1017, 1026 (5th Cir. 1996) (emphasis omitted)).

Our decision in Wilkerson is closely analogous to this case and weighs heavily in favor of granting habeas relief. In Wilkerson, the State's only evidence that the petitioner committed the murder in question was the eyewitness testimony of one inmate, "Riley." See 233 F.3d at 888. Although authorities found weapons in various prisoners' possession, they never recovered the murder weapon, and there was no evidence, physical or otherwise, linking him to the murder. See id. Accordingly, Riley's testimony was critical to the State securing a conviction. See id. Wilkerson contended that the trial court violated his rights under the Confrontation Clause by unduly restricting cross-examination of Riley. See id. at 890. Specifically, the trial court refused to allow defense counsel to

---

[20] Wilkerson filed his habeas petition in 1995, before AEDPA was enacted. Nevertheless, Wilkerson applied the same Brecht standard that we apply today post-AEDPA. See Fry, 127 S. Ct. at 2326-28; Hughes, 2008 WL 2300252, at *8.

cross-examine Riley about certain letters he had written to state officials concerning his request to be transferred within the prison system and his decision to testify for the State. See id. We granted habeas relief under Brecht, holding that the trial court's disallowance of such cross-examination was an unconstitutional restriction of Wilkerson's rights that could not be considered harmless. See id. at 890-92.

As was the situation with Riley's testimony in Wilkerson, the State's "case hinged on [Scott's] supposed eyewitness account of [Welch's and Jackson's] murder[s]" because "there was no other evidence, physical or otherwise, that connected [Burbank] to the crime." See id. at 892. But when Scott was testifying, the trial court stopped defense counsel from questioning her about a proposed plea agreement whereby the State would not Quad-Bill her, and she would serve only one year in prison rather than facing the possibility of twenty years to life as a fourth offender. That the trial court allowed defense counsel to elicit testimony from Scott that she was a fourth offender, intended to plead guilty the following day in a trial that had been continued twenty-two times, and had once considered a deal for thirty months in prison, is no substitute for testimony concerning a tentative deal that could convert a twenty-to-life sentence into a one-year sentence,[21] especially when testimony concerning that plea agreement and the agreement itself were proffered in camera following the State's case-in-chief. See Giglio v. United States, 405 U.S. 150, 155 (1972) (holding that the jury is entitled to know of any understanding or agreement

---

[21] We acknowledge that defense counsel was permitted significant latitude in impeaching Scott by casting doubt upon her perception and memory and by demonstrating Scott's willingness to change her story. We think, though, that cross-examining Scott based upon the proposed plea agreement was qualitatively different. This testimony would have borne directly upon Scott's bias and her incentive to lie to curry favor with the State. Accordingly, is was not cumulative with her other testimony admitting heavy drug use, including on the day of the murders, and admitting that she was willing to testify that she had misidentified Burbank in exchange for help from his private investigator with respect to the charges pending against her.

between the State and its key witness in the context of a Brady violation). Nor does the fact that the agreement never was finalized or that Scott ultimately pled innocent and was acquitted excuse the trial court's error. See Wilkerson, 233 F.3d at 891 (citing United States v. Hall, 653 F.2d 1002, 1008 (5th Cir. 1981) (holding that what matters is not the existence of the deal but whether the witness believes that it exists)). Simply put, if "the jury believed that [Scott] was testifying to curry favor with the state, or that [she] expected some real or perceived benefit in return, the state's case would have been seriously undermined." See Wilkerson, 233 F.3d at 892. Allowing cross-examination concerning Scott's potential one-year plea agreement likely would have had such an effect. Accordingly, "it is apparent that there is more than a reasonable possibility that the verdict may have been different had defense counsel been permitted to inquire fully into" the potential one-year plea agreement. See id. This constitutionally erroneous ruling by the trial court was not harmless and therefore merits habeas relief. See Brecht, 507 U.S. at 638.

### III

For the foregoing reasons, we AFFIRM the grant of habeas relief.