IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 13, 2008

Charles R. Fulbruge III
Clerk

No. 07-30709

BRUCE TAYLOR

Petitioner - Appellee

v.

BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY

Respondent - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, STEWART, and SOUTHWICK, Circuit Judges.

SOUTHWICK, Circuit Judge:

Warden Burl Cain appeals the district court's grant of habeas relief to inmate Bruce Taylor. We affirm.

FACTUAL BACKGROUND AND STATE CONVICTION

Bruce Taylor was convicted by a jury of second-degree murder of Leroy Batiste and sentenced to life in prison without parole. See generally State v. Taylor, No. 2002-KA-0385, slip op. at 1-9 (La. Ct. App. 2002).

In New Orleans on May 4, 2001, Leroy Batiste was shot in the leg. After an investigation, Anthony and Alfred Moliere – Petitioner Taylor's brothers – were arrested in connection with the shooting. They were released after the next

shooting we describe. Batiste's mother testified that animosity existed between the Molieres and her son because of a dispute over a borrowed screwdriver.

Ten days after Batiste was wounded, New Orleans police again answered a call about a shooting. Leroy Batiste was found unresponsive and bleeding, having sustained six gunshot wounds. At least two of the gunshot wounds were fatal, causing Batiste to die of "spinal cord shock."

Detective Fred Bates investigated the homicide. By the time Bates arrived on the scene, the victim had been taken to the hospital. The victim's vehicle had three bullet holes in it from the shooting ten days before. Seven .380 caliber cartridge casings, made by two different manufacturers, were recovered at the scene. An eighth casing was discovered the next day.

While at the scene the day after the murder, Bates said a citizen slipped him a note indicating he wanted to talk with the officer – elsewhere. Bates spoke with that person several blocks from the scene. Due to hearsay objections, testimony on what Bates was told was minimal and elliptical. We do know that, based on the conversation with the individual, Bates developed Bruce Taylor as a suspect and prepared a photo lineup. Bates's testimony about this witness, unnamed and of course not cross-examined, is the claimed error in this case.

According to Bates, another witness to the crime, Osborne Parker, also came forward. Parker identified Taylor by name, saying he had grown up with him. Bates showed Parker the photo lineup he had prepared, and Parker immediately selected Taylor's photo. A search of Taylor's home did not yield any weapons or clothing connected to the case.

At trial, Parker testified that he once lived near both Taylor and the victim Batiste. He had known Taylor almost his entire life, but they were not close friends. Batiste had not been a good friend, either. According to Parker, on the night of the murder, he saw Taylor sitting in his doorway. Parker was looking for his friend Keyoka Riley. He asked Taylor if he had seen her. Taylor replied

that he had not seen her, and then told Parker that "I'm just kind of messed up," "I'm just kind of fu---- up right now in the head."

Parker found Keyoka Riley, and they walked to a store across the highway. On the way back, Parker heard gunshots. He looked towards the sounds and saw someone standing over the victim and shooting. The shooter ran through a cut in the apartment complex, but he was not running towards Taylor's apartment, which was perhaps two apartment buildings away from the scene of the shooting. Parker said he went to his own apartment immediately after the shooting to telephone the police, then went back to comfort the victim, who was still conscious.

Parker described the perpetrator as wearing the same clothing that he had just seen the Defendant wearing – black jeans and a dark shirt, with a bandana around his neck. He admitted that he did not immediately recognize the Defendant. Twenty minutes after the shooting, Parker saw Taylor again. It was at that time that he "thought about it," i.e., that the shooter might have been Taylor. By this time, Taylor was wearing a white shirt and shorts. Taylor said he had been in the shower at the time of the shooting. Parker felt that Taylor's shower explanation seemed contrived. In light of what had happened between Batiste and the Defendant's brothers, he thought Taylor was lying.

Parker conceded on cross examination that the shooter only "basically" looked like the Defendant. When asked whether that meant the shooter looked like the Defendant, was "similar" to him, "could have been" him, or "maybe" was him, Parker replied "[a]ll of that." When pushed as to how definite he was, Parker said that "it was him." Defense counsel pointed out that "basically" did not mean "it was him," to which Parker responded, "okay."

Although Parker gave his name to police when he called 911 immediately after the shooting, he spoke to no officers at the scene. He told no one that night that Taylor was the shooter. Parker testified on redirect examination that he

did not contact Detective Bates immediately because he did not want to get involved and because he felt that the police would solve the crime, considering the "feuding" between Bruce Taylor's brothers and the victim.

Parker admitted that the district attorney's office gave him money to rent a house. He denied that was why he got involved in the case. Parker stated that he did not want to get involved in the first place. He emphasized that he had seen the victim dying on the ground and that it had greatly disturbed him. That experience is what prompted his action.

At the time of the shooting, Osborne Parker lived with Keyoka Riley in Riley's mother's apartment. Riley confirmed Parker's testimony that they had gone to the store and heard shots on their way back. Riley stated that Parker ran into their apartment, entered before her, and held the door open for her to bring in her daughter. But Riley testified that she did not see anyone shooting and did not believe Parker could have seen anything from where they were. She also stated that if Parker had seen a person, he could not have made an identification because of darkness. She said that Parker never told her that he saw Bruce Taylor shoot the victim, despite the fact that they generally talked about everything. Significantly, Riley also indicated that she did not think it was a good idea for Parker to testify. In addition, Parker testified on rebuttal that Riley told him that she was going to testify for the defense because she did not want anything to happen to Parker.

Taylor lived in an apartment with his parents and his two brothers. His parents and fiancée testified as alibi witnesses. These witnesses supported Taylor's explanation that he had been in the shower when they learned from someone else about the shooting. Testimony varied about how long a witness could confirm Taylor was in the apartment, though one witness said he had been there from a time long before the shooting.

A jury convicted Taylor of second-degree murder. He was sentenced to life

4

in prison without parole.  The Louisiana Court of Appeal affirmed, and the Louisiana Supreme Court denied his writ applications.

POST-CONVICTION PROCEEDINGS

Taylor filed an application for state postconviction relief, which was denied.  His subsequent applications to the state intermediate court and supreme court for supervisory writs and review were denied.

Having pursued relief in the Louisiana state courts, Taylor turned to federal court on March 28, 2006, when he filed a habeas petition pursuant to 28 U.S.C. § 2254.  Taylor raised several claims, including that "the [trial court] erred in allowing the State to admit and argue as substantive evidence the hearsay statements of eyewitnesses."  Taylor's hearsay claim is based on Detective Bates's testimony about the mystery witness who slipped him a note at the scene.  A hearsay objection was made to the questioning, but it was rejected.  This is the relevant part of Detective Bates's testimony:

> A.  . . . I did receive a note saying that someone wanted to speak to me.  The person did not want to talk to me on the scene due to the fact that, again, this is a scatter site area where everybody knows everybody and to be seen talking to the police in some instances is not – not kosher in the neighborhood.  So I got in my vehicle, went approximately three to four blocks away from the area where I could not be seen, had a conversation with an individual and during this conversation, learned some information. I took this information that I learned and from that information was able to develop a suspect.
>
> Q.  And Detective, as per this end of your investigation, what was the name of your suspect?
>
> A.  First name only was Bruce.  The description given was he is one of the brothers of the Molieres. . . .
>
> A . . . This description that I got . . . was only the fact that the perpetrator was Bruce . . . .

In addition to the testimony, error is also alleged in referring to the testimony in the prosecutor's rebuttal argument.  The prosecutor was responding

to a defense argument that there was no corroboration of Osborne Parker's arguably inconclusive identification of Taylor as the assailant:

> Prosecutor: Now, corroboration? You want corroboration? [Defense counsel] seems to forget one little detail in the investigation of this case. Detective Bates told you that he spoke to several people . . . within the days following–
>
> Def. counsel: I'm gonna object if he's gonna be talking about what anybody said to this officer that's not here today.
>
> Court: He has a right to make his argument, Mr. Meyer. I do not know what he's going to say. . . . All right, proceed.
>
> Prosecutor: Detective Bates spoke to three people before he even spoke to Osborne Parker. He began his investigation. He posted up his cards. He did everything that he sat here and explained all very frankly to you what he did. What we forget and what's easy to overlook is that Detective Bates developed the name of a suspect before he had any idea who Osborne Parker was. He had the name Bruce Taylor already. . . . In this case we had a suspect and it was corroborated by Osborne Parker.

The defense objected again and was again overruled.

The State filed an answer to the habeas petition, addressing Taylor's claims on the merits and specifically noting that "[r]eview of the record shows that these issues are exhausted." The admission about exhaustion was limited to the Defendant's arguments based solely on hearsay issues, not to exhausting a constitutional challenge based on the Confrontation Clause.

The magistrate judge recommended that Taylor's claims be rejected and that the petition be dismissed. With regard to Taylor's hearsay evidence claim, the magistrate judge noted that, although federal habeas relief is not available to correct state evidentiary errors, Taylor's claim implicated his Sixth Amendment rights under the Confrontation Clause. The "implication" was something first raised in this case by the magistrate, who nonetheless concluded that Taylor had not met the Section 2254(d)(1) requirement that relief only be

granted "if petitioner demonstrates that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court." The magistrate judge did not conclude that the trial court's error was a critical or significant enough factor in the course of the entire trial to warrant habeas relief.

The district court adopted the magistrate judge's report and recommendation, "except with respect to the recommendation on Petitioner's claim regarding the admission of hearsay evidence." The district court concluded that the hearsay evidence presented by Detective Bates was crucial to the State's conviction. The court noted that no physical evidence linked Taylor to the crime, and that Parker's testimony "was equivocal at best." Accordingly, the court found that Taylor's Sixth Amendment Confrontation Clause rights were clearly violated, and that the admission of the hearsay evidence was not harmless, resulting in a fundamentally unfair trial. Accordingly, the court granted Taylor's habeas petition.

The State moved for an amendment or alteration of the judgment. Included was an argument that, because Taylor had not raised a Confrontation Clause or any other federal constitutional claim in state court, those claims were unexhausted. The district court denied the motion without explanation.

The State timely appealed the judgment to this Court.

## DISCUSSION

Our review occurs in two steps. First, we analyze the issues that arise from the need to present, i.e., "exhaust," claims in state court first. Finding no bar to proceeding, we then examine the merits of the constitutional issue.

### A. Exhaustion

This case presents both the question of whether Taylor has properly exhausted his claim and also the analytically prior question of whether the State waived or forfeited the exhaustion requirement.

Exhaustion is a statutory obligation on petitioners who seek federal habeas relief to present and pursue all claims in state court prior to requesting federal collateral relief. 28 U.S.C. § 2254(b). Even when the inmate presents to the state court all the relevant facts and makes a related state-law claim, there is no exhaustion unless he "asserts the claim in terms so particular as to call to mind a specific right protected by the [federal] Constitution or alleges a pattern of facts that is well within the mainstream of constitutional litigation." Kittelson v. Dretke, 426 F.3d 306, 315 (5th Cir. 2005) (quotations and citation omitted). This means that a petitioner must alert the state courts to the "federal nature" of the claim. Baldwin v. Reese, 541 U.S. 27, 33 (2004).

An issue, such as exhaustion, that an appellant could raise to justify reversal may be waived. We recognize that the term "waiver" may mean different things in the context of procedural exhaustion. The State may fail to raise the non-exhaustion defense; the State may instead expressly waive any challenge on exhaustion grounds by conceding that the petitioner exhausted the claims in state court. The second type is not at issue here, even though the State in its habeas response initially conceded that Taylor had exhausted. We do not find an express waiver because the State was conceding exhaustion only as to the "alleged introduction of inadmissible hearsay testimony," which was the claim Taylor made before the Louisiana state courts and in his federal habeas petition. The State has not expressly waived exhaustion as to Taylor's Confrontation Clause claim. In fact, it raised the defense in a motion after the district court had recast Taylor's claim as a Confrontation Clause issue.

As to waiver by a party's failure to raise an issue, it is important that Congress provided that a state shall not be deemed to have made an implicit waiver of an inmate's obligation to exhaust or be estopped from asserting such a defect; waiver of the exhaustion requirement must be expressly made by counsel. 28 U.S.C. § 2254(b)(3).

Considering the importance of exhaustion in the statutory scheme for post-conviction relief in federal court from a state inmate's conviction, and in light of the briefing that has been presented on the issue after oral argument, we conclude that there has been no waiver.

The relevant exhaustion inquiry is whether Taylor fairly presented the federal constitutional issue to the state courts on direct appeal.[1] This court reviews de novo the legal question whether a federal habeas petitioner has exhausted his claims. Morris v. Dretke, 413 F.3d 490, 491 (5th Cir. 2005).

The argument that Taylor did not raise a federal constitutional claim is a reasonable one. Taylor's filings in the state court never explicitly mention the federal Constitution. His brief before the Louisiana Court of Appeal framed the claim in hearsay terms: "The Trial Court erred in allowing the State to admit and argue as substantive evidence the hearsay statements of eyewitnesses." Taylor cited the state's evidentiary code and state cases in support.

While Taylor did not label his claim as a federal constitutional one, his brief made the type of arguments that support a Confrontation Clause claim. Taylor complained that the prosecution relied heavily on hearsay testimony to corroborate Osborne Parker's hesitant identification, arguing "[i]n effect, the State received the benefit of eyewitness testimony corroborating Parker's story, without the danger of cross-examination and impeachment." Further, Taylor cited a passage from a Louisiana Supreme Court case criticizing the use of "explanation of the officer's actions" as a hearsay exception to allow admittance of "an out-of-court declaration when the so-called 'explanation' involves a direct assertion of criminal activity against the accused." State v. Hearold, 603 So. 2d 731, 737-38 (La. 1992). "Law enforcement officers may not testify as to the contents of an informant's tip because such testimony violates the accused's

---

[1] Taylor did not challenge the relevant testimony in any way in state habeas proceedings, but a presentation in state habeas is not a component of exhaustion if the issue was presented on the direct appeal. Morris v. Dretke, 413 F.3d 484, 491 (5th Cir. 2001).

constitutional right to confront and cross-examine his accusers." Id. at 737 (emphasis added) (citing State v. Banks, 439 So. 2d 407, 410 (La. 1983), in which the court concluded that such hearsay violated both the Louisiana and federal Constitutions). In addition, Taylor cited a Louisiana Supreme Court case explicitly connecting the error in allowing such hearsay testimony to an accused's federal Confrontation Clause rights. State v. Wille, 559 So. 2d 1321, 1329-30 (La. 1990).

Taylor's failure to frame the claim in constitutional terms makes exhaustion less than clear. However, this court has before looked to the content of the cases cited in the state court filings in order to determine whether a claim was "fairly presented." See Kittelson, 426 F.3d at 317. Doing so here suggests that the nature of Taylor's challenge was more sweeping than simply opposing a state-law evidentiary ruling. Such an understanding is consistent with the Louisiana intermediate court's reliance on a precedent in which the defendant claimed that "the detective's testimony circumvented the hearsay rule and deprived [the defendant] of the right to confront and cross-examine the absent informant/accuser." State v. Dangerfield, 816 So. 2d 885, 900 (La. Ct. App. 2002). The Dangerfield court interpreted a similarly made challenge to the same kind of hearsay evidence as raising a federal Confrontation Clause claim. Id.

The Louisiana Court of Appeal here did not explicitly indicate that it was evaluating a federal Confrontation Clause claim, but its use of Dangerfield is a signal that it found more to be involved than a hearsay claim. We conclude that Taylor adequately exhausted his claims in state court.

B. Merits of Taylor's habeas petition

1. The AEDPA standard

This court has "no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect." Martinez v. Dretke, 404

F.3d 878, 884 (5th Cir. 2005). Instead, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court is restricted in granting a petition for a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254.

Under the "contrary to" clause of Section (d)(1), a federal court may only grant habeas relief if the state court decided a case differently than the United States Supreme Court previously decided a case on a set of nearly identical facts. Under the "unreasonable application" clause, a court may grant habeas relief if the state court misapplied the relevant legal principles to the facts. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000). As there is no United States Supreme Court case with nearly identical facts to this one, this case is governed by the "unreasonable application" prong of Section 2254(d).

2. Unreasonable application of clearly established federal law

The necessary inquiry is whether the Louisiana Court of Appeal unreasonably applied clearly established federal law as determined by the United States Supreme Court when it denied relief to Taylor. That court analyzed whether there was error in admitting Detective Bates's testimony about the unidentified witness, as well as the prosecution's references to that testimony in closing argument. However, the state appellate court did not resolve whether the trial court committed constitutional error in this regard. Instead, it merely concluded that any error was harmless.

Even though the Louisiana Court of Appeal only answered the harmless error question, this court must first consider whether the admission of Detective Bates's testimony was an "unreasonable application" of federal law. AEDPA deference is due to state court decisions, even when the state court does not explicitly address the relevant issue. See Schaetzle v. Cockrell, 343 F.3d 440, 443 (5th Cir. 2003) ("Because a federal habeas court only reviews the reasonableness of the state court's ultimate decision, the AEDPA inquiry is not altered when . . . state habeas relief is denied without an opinion."). Accordingly, AEDPA deference extends to the preliminary question of whether there was legal error, in addition to questions of the harmlessness of error.

We now turn to the issue of legal error. Under the Sixth Amendment, a criminal defendant has the right "to be confronted with the witnesses against him." Coy v. Iowa, 487 U.S. 1012, 1015 (1988). The Confrontation Clause generally bars witnesses from reporting the out-of-court statements of nontestifying declarants. See Crawford v. Washington, 541 U.S. 36, 54-56 (2004). Crawford was decided after the completion of Taylor's direct appeal. But even under the Supreme Court's earlier decisions, the Confrontation Clause generally barred the admission of statements made by out-of-court declarants for the truth of the matter asserted.[2] Ohio v. Roberts, 448 U.S. 56, 65 (1980). The only exception was when the declarant's statement fell into a "firmly rooted hearsay exception" or when there was a showing that the statement bore "particularized guarantees of trustworthiness." Id. at 66. This exception assumed the declarant was legitimately unavailable to testify after "the prosecutorial authorities [] made a good-faith effort to obtain his presence at trial." Id. at 74.

---

[2] The Crawford court would reject Roberts on the ground that it did not sufficiently protect Confrontation Clause rights. See Crawford, 541 U.S. at 63 ("The unpardonable vice of the Roberts test . . . is its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude.")

Detective Bates testified about highly incriminating information from the unidentified eyewitness. The prosecution's reference to that testimony in closing argument reinforced it. There was no hearsay exception, firmly rooted or otherwise, and Taylor was denied his right to confront the witness.

Police officers cannot, through their trial testimony, refer to the substance of statements given to them by nontestifying witnesses in the course of their investigation, when those statements inculpate the defendant. When the statement from an out-of-court witness is offered for its truth, constitutional error can arise. This principle is well established. See 2 CHARLES T. MCCORMICK, MCCORMICK ON EVIDENCE § 249, at 104 (4th ed. 1992); see also United States v. Silva, 380 F.3d 1018, 1020 (7th Cir. 2004) ("Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination . . . would eviscerate the constitutional right to confront and cross-examine one's accusers.") This Circuit has applied this analysis. See, e.g., United States v. Hernandez, 750 F.2d 1256, 1257-58 (5th Cir. 1985) (inadmissible hearsay for a DEA agent to testify that "[w]e received a referral by the U.S. Customs as [defendant] being a drug smuggler"); United States v. Kang, 934 F.2d 621, 627 (5th Cir. 1991) (similar).

Louisiana state courts have recognized this principle. See, e.g., Hearold, 603 So. 2d at 737 ("Law enforcement officers may not testify as to the contents of an informant's tip because such testimony violates the accused's constitutional right to confront and cross-examine his accusers.")

Applying this understanding, it is apparent that Detective Bates's testimony indicating that an unidentified, nontestifying witness identified the defendant as "the perpetrator," along with the prosecution's references to that testimony in closing argument, was hearsay. Under Ohio v. Roberts, the admission of such hearsay statements against a criminal defendant violates the Confrontation Clause, unless the declarant's statement either falls within a

firmly rooted hearsay exception or bears particularized guarantees of trustworthiness. Neither of those bases was affirmatively shown, nor is either established by the record. Accordingly, the admission of this testimony against Taylor was a violation of Roberts, which was clearly established Supreme Court precedent at the time of Taylor's trial.

Even under the deference required by Section 2254(d), which limits us to deciding whether any implicit rejection of Taylor's argument was an unreasonable application of federal law, we find there to be error. Unless the error may be considered harmless, relief is justified.

### 3. Harmless error

The final question is whether the error committed by the Louisiana courts was harmless and therefore not a basis for relief. On habeas review under AEDPA, the prejudice of constitutional error in a state-court criminal trial is measured by the "substantial and injurious effect" standard of Brecht v. Abrahamson, 507 U.S. 619 (1993). See, e.g., Hughes v. Quarterman, 530 F.3d 336, 345 (5th Cir. 2008). The Louisiana appellate court has already measured the harmfulness of the trial court's decision and found reversal not to be required. We decide whether, in reaching that conclusion, the state court applied harmless error analysis in an "objectively unreasonable" manner. Id.

The Louisiana trial court's decision to permit references to the testimony of the unidentified eyewitness is sufficiently prejudicial if it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. There are guideposts in applying the standard to the facts of a given case. When a court finds itself "in virtual equipoise as to the harmlessness of the error under the Brecht standard, the court should treat the error as if it affected the verdict." Fry v. Pliler, 127 S. Ct. 2321, 2327 n.3 (2007) (citations and quotations omitted); see also Robertson v. Cain, 324 F.3d 297, 305 (5th Cir. 2003) ("[T]he petitioner should prevail whenever the record is so evenly balanced that

a conscientious judge is in grave doubt."). Conversely, an error is insufficient under Brecht when the evidence of the defendant's guilt is overwhelming. See, e.g., Burgess v. Dretke, 350 F.3d 461, 472 (5th Cir. 2003).

In this case, the evidence of guilt is far from overwhelming. Though Taylor could be thought to have a motive to harm the victim, there was no physical evidence linking him to the crime. Only a single eyewitness – Osborne Parker – identified the defendant at the crime scene. His testimony concerning the actual identification was markedly indefinite. Apart from Detective Bates's reference to the unidentified source, there was no corroboration of Parker's testimony. Keyoka Riley, who was with Parker throughout the time of the shooting, did not corroborate his testimony, noted the darkness at the time, and stated that she "couldn't see how he could see anything." Parker and Riley were close friends who lived together, yet Riley testified that Parker never told her that he had seen the defendant.[3]

In addition, the defendant also had several alibi witnesses. Although there was every reason that jurors could question the credibility of these witnesses because of their affinity for Taylor, doubts about the strength of the affirmative evidence of innocence does not add to the limited evidence of guilt.

We find the harmfulness here at least as strong as that presented in another recent decision. Burbank v. Cain, 535 F.3d 350 (5th Cir. 2008). In that precedent, there was no physical evidence linking the accused to the murder;

---

[3] Indeed, the prosecution's repeated references to the unidentified witness as a corroborating source of information, were no doubt an effort to strengthen testimony that was quite equivocal standing on its own. Examples include:

– Detective Bates on direct: "I had a conversation with an individual and during this conversation, learned some information. . . . [F]rom that information [I] was able to develop a suspect. . . . The description given was he is one of the brothers of the Molieres."

– Detective Bates on direct: "[t]his description that I got . . . was . . . that the perpetrator was Bruce."

– Prosecution on close, "Now, corroboration? You want corroboration? . . . Detective Bates had developed the name of a suspect before he had any idea who Osborne Parker was. He had the name Bruce Taylor already."

only a single witness identified him as the shooter. Id. at 352. In contrast to the present case, the identifying witness in Burbank took the stand. The defendant was able to elicit testimony casting doubt on the witness's credibility, including that she had been drinking and taking drugs on the day of the killings, that she had considered falsely testifying, that she had three prior convictions, and that she had been recently arrested again and was facing at least five years in prison. Id. at 352-53. The defense also implied that she regularly smoked crack and that she "faced twenty to life" if she did not identify the defendant as the killer. Id. at 353-54. Still, we granted habeas relief, citing violation of the Confrontation Clause due to the trial court's refusal to allow two additional defense witnesses who would have impeached the eyewitness. Id. at 359.

In the present case, the comment attributed to the nontestifying witness was critical, as the other evidence was not at all overwhelming. Compare Wilkerson v. Cain, 233 F.3d 886, 891-92 (5th Cir. 2000) (habeas relief warranted where defendant could not effectively cross-examine a witness "crucial to the prosecution's case"), with Burgess, 350 F.3d at 472 (harmless error where there was "a wealth of evidence validly in the record that provided overwhelming evidence of Burgess's guilt"), and Cotton v. Cockrell, 343 F.3d 746, 752 (5th Cir 2003)(describing the "sea of evidence" incriminating the defendant).

In light of the dependency of the prosecution on a single witness's less-than-certain identification, combined with the use of tainted hearsay evidence both in testimony and in closing argument asserting that the defendant was "the perpetrator," we conclude that the Louisiana Court of Appeal's holding that any error would have been harmless was contrary to, and also an unreasonable application of, federal law as clearly established by the United States Supreme Court. Accordingly, Taylor is entitled to habeas relief.

The district court judgment is AFFIRMED.