**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SANTANA OCAMPO,
          *Petitioner-Appellant,*

v.

ELDON VAIL,
          *Respondent-Appellee.*

No. 08-35586

D.C. No.
3:07-cv-05671-FDB

OPINION

Appeal from the United States District Court
for the Western District of Washington
Franklin D. Burgess, Senior District Judge, Presiding

Argued and Submitted
August 2, 2010—Seattle, Washington

Filed June 9, 2011

Before: William C. Canby, Jr., John T. Noonan and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

7981

**COUNSEL**

Suzanne Lee Elliott, Seattle, Washington, for the petitioner-appellant.

Robert M. McKenna, Attorney General of Washington, and Gregory J. Rosen, Assistant Attorney General, Olympia, Washington, for the respondent-appellee.

**OPINION**

BERZON, Circuit Judge:

Following a jury trial in Washington state court, Santana Ocampo was found guilty of first-degree murder for the

August 9, 2003, fatal shooting of Julio Morales-Castro. Ocampo maintains that his constitutional right to confront witnesses was denied in his jury trial by the admission of testimony by law enforcement officers regarding statements made by a potential witness who did not testify. The district court denied his federal petition for habeas corpus relief. We reverse.

## I.

Julio Morales-Castro was fatally shot in the head on the evening of August 9, 2003, while sitting in his car outside a pool hall in Tacoma, Washington. Members of the Hispanic gang Surreño 13 frequently "hung out" in the area. A witness at the scene reported seeing a blue minivan driving away after the shooting; other witnesses reported seeing three young, male, Hispanic gang members running from the scene.

The primary issue at trial was whether Ocampo was present at the scene of the crime. The prosecution claimed that Ocampo was in the van and, with a Surreño 13 gang member named Jose Hernandez,[1] attempted to steal Morales-Castro's car before shooting him. Ocampo's defense was that he was at a party, a Quinceañera,[2] the entire time.

Detectives investigating the shooting showed photos of several Surreño 13 gang members to witnesses, who identified Hernandez as one of the young men running from the scene.[3]

---

[1]Hernandez testified that he was not a gang member. But both the prosecution and the defense maintained that he was, and detectives explained that he was in their reports as a Surreño 13 gang member or a known associate of the gang.

[2]A Quinceañera is a coming-of-age ceremony held by some Latin Americans on a girl's fifteenth birthday.

[3]Witnesses also identified a gang member named Nick Solis as one of the young men running from the scene. Detectives did not follow up on this lead because Hernandez told them that Solis was not present. Whether Hernandez's claim that only he and Ocampo were present at the shooting was believable, and whether the detectives had adequately corroborated that Ocampo was present and Solis was not, was a major issue in the trial.

Hernandez implicated Ocampo and led detectives to Baldemar Vela and Mesial Vasquez, who were also interviewed.

At trial, Detective Webb testified that during his first interview with police, Hernandez named the person who shot Morales-Castro. Webb went on to state that, on the basis of this information, he drafted a search warrant for Ocampo's residence and arrested Ocampo when the search warrant was served. Webb also reported that on the basis of the information provided by Hernandez, he believed Ocampo was the shooter.

Hernandez also testified at the trial. He named Ocampo as the shooter, maintaining that his factual account at trial was consistent with the information he provided the police in his initial post-arrest statement.[4]

Another witness at Ocampo's trial was Vela. (Both he and Hernandez were problematic witnesses for reasons discussed below.) Vasquez, in contrast, did not appear at trial. Instead, two detectives were allowed to testify that his statements to police had corroborated Hernandez's statements to the police, and by implication, his testimony at trial. This appeal is focused on those detectives' testimony about what Vasquez had said to the police.

Although this appeal centers on the two detectives' testimony about Vasquez, we begin by discussing Vela's and Hernandez's police interviews and trial testimony in detail. Their statements and testimony are pertinent both to the merits of the confrontation issue, for reasons that will appear, and to assessing the degree of prejudice caused by any Confrontation Clause violation.

---

[4]While the defense impeached Hernandez with several inconsistencies between his testimony and his post-arrest statement, there was no suggestion that Hernandez's identification of Ocampo as the shooter was in any way inconsistent with his post-arrest statement to police.

## A. *Vela*

Vela was reluctant to provide information to police because he was afraid of retaliation by the Surreño 13 gang. He did tell detectives, however, the following:

Vela, out drinking with Hernandez on the night of the shooting, gave a ride in his van to Hernandez and two of Hernandez's friends. When Vela stopped near the pool hall to purchase beer, Hernandez and his two friends got out of the van and went in one direction, while Vela walked in another. About two minutes before Hernandez reappeared, Vela heard what he thought was the sound of a firecracker.

When he returned from wherever he had gone, Hernandez, nervous and sweating, found Vela outside the store and insisted that they needed to leave because "someone was tripping on him."[5] Vela and Hernandez then took different routes back to Vela's van. When Vela arrived, Hernandez and his two friends were already seated in the van. According to Vela, he drove, and Hernandez was in the front passenger seat. As he was driving, Vela heard someone in the backseat say, "I was tripping, so I had to shoot him."

After giving his story, Vela identified Hernandez from a montage of black-and-white photographs. What happened next is disputed: According to Vela's trial testimony, he could not identify the two friends with Hernandez the night of the shooting. During his interrogation, the detectives gave him a single, color, Polaroid photograph and asked if the person in the photograph was one of Hernandez's friends. Vela testified that when he told the detectives that he did not know, they responded by telling Vela that the person in the photograph had already admitted to being in the van. Vela then responded

---

[5]Vela explained this statement as meaning "someone was messing with him [or] something of that nature."

by saying, "He probably was. If he is saying he was in my van, then he was."

Detectives Yerbury and Ringer testified differently from Vela. They explained that when interviewed, Vela was so scared of gang retaliation that he talked about moving away or joining the military. According to the detectives, Vela "minimized his knowledge" and spoke in vague generalities. The detectives showed Vela a photograph of Ocampo, who was being interviewed in a different room. They did this because they were concerned that if they waited until Ocampo had been booked, Vela would be uncooperative and back-pedal. According to the detectives, Vela readily identified Ocampo as one of Hernandez's two friends,[6] although he did not know if Ocampo was the one who spoke of shooting someone.

## B. *Hernandez*

Hernandez agreed to testify for the State in exchange for a second-degree murder plea agreement with a recommended sentence of 244 months.[7] He testified as follows:

On the night of the shooting, Vela gave him, Ocampo and Vasquez a ride. When Vela stopped at the pool hall, Hernandez and Ocampo wandered off and decided to steal a car they saw because it had valuable tires and rims. Ocampo told Hernandez that he had a gun and would keep a lookout while

---

[6]Before trial, the trial court denied Ocampo's motion to suppress Vela's identification. The court found Vela not credible in denying he had identified Ocampo and in claiming that he had not seen Hernandez's friends on the night of the shooting sufficiently well to identify them.

[7]Hernandez was originally offered a deal with a recommended sentence of detention in a juvenile facility until the age of 21 in exchange for testimony against Ocampo. The state revoked the deal after Hernandez told two juvenile detention officers that he was the shooter. After his confessions, he was recharged as an adult and agreed to the second, less favorable plea agreement.

Hernandez broke into the car. As Hernandez was walking toward the car, Morales-Castro left the pool hall and headed toward the same car. Hernandez then attempted to walk away, but Ocampo urged him not to. Complying, Hernandez continued forward and stood near the front of Morales-Castro's car while Ocampo approached Morales-Castro and asked him for bus money. Morales-Castro responded he had no money. He then attempted to drive off, but Ocampo shot him in the head.

The State also called a juvenile detention officer, who testified that Hernandez had confided that he was in custody for murder and that he was the shooter. He informed her that she was the only one who knew the truth, and that he was going to plead not guilty. Hernandez then told another detention officer the same thing. The two officers decided that they had to file a report about his confessions and did so. The State argued to the jury that Hernandez's confessions were lies, designed to show off to his friends and to ensure that he was not regarded as a snitch.

## C. *Vasquez*

As noted, this case centers on what Detectives Ringer and Webb said at trial about corroborating statements made by the other passenger in the van that night, Vasquez. Vasquez was not available at trial because, according to the State's "best information . . . he and his family [had] returned to Mexico."

Ringer had not personally interrogated Vasquez. He nonetheless testified that Vasquez's statements helped eliminate as suspects some individuals whom other witnesses had identified as being involved in the shooting:[8]

> **A**  As we investigated further, we found that one of
>        the photographs, Jose Hernandez's identification

---

[8]The apparent double-hearsay problem presented by this scenario is not an issue raised in this appeal.

of him, was accurate, but then some of the others were people that they knew but had not actually been involved in the shooting.

**Q** Okay. How were you able to determine that?

**A** Well, eventually Jose Hernandez was arrested, he gave a statement. Later we contacted Baldemar Vela, and he gave a statement that verified what Jose Hernandez said. And still later, Mesial Vasquez was interviewed and he also verified the other two. And these excluded several individuals that had been named that night [by witnesses who saw young men fleeing after the shooting].

**Q** So he verified — Baldemar and he verified Jose Hernandez's statement?

**A** That's my understanding, yes.

Later in his testimony, Ringer again emphasized that Vasquez's statements had been used to rule out people who had previously been suspects:

**Q** Now, some of the photographs that were identified by these people later turned out, at least according to your investigation, to not be involved in this case, right?

**A** That's correct.

**Q** And the reason you say you knew that was because of a statement given by Jose Hernandez, right?

**A** That was just part of it. Statement given by Jose Hernandez, statement given by Baldemar Vela, statement by Mesial Vasquez.

The prosecution later sought to use Detective Ringer's testimony about Vasquez's statements to confirm Hernandez's participation and to implicate Ocampo:

> **Q** Were you able to corroborate that [Hernandez] actually was a participant?
>
> **A** Yes.
>
> **Q** How were you able to do that?
>
> **A** Through his own — his own admissions, through Baldemar Vela, through Mesial Vasquez.
>
> **Q** What do you mean through Mesial Vasquez?
>
> **A** My understanding, [sic] statement he gave also indicated that [Hernandez] was present.
>
> **Q** Okay. And Mesial Vasquez would be the fourth person in the van?
>
> **A** That's correct.
>
> **Q** And at some point, Santana Ocampo's name surfaced during the course of the investigation?
>
> **A** It did.
>
> . . .
>
> **Q** Were you able to corroborate that he was in the van at the time of the shooting?
>
> **[DEFENSE COUNSEL]:** I am going to object, request a side-bar.

. . .

(Jury not present.)

**[DEFENSE COUNSEL]:** Your honor, with the questioning that's happening, I see where this is going. They are going to bring in next a statement by Mesial Vasquez [that] Santana Ocampo was in the van. Mesial Vasquez is not here, we are not able to confront this witness, don't know where he is. State's not going to produce him and I want to make sure there is no hearsay from Mesial Vasquez of my client being in that van coming into this testimony. Improper, it's hearsay, and we are not able to confront this witness, who is absolutely confrontable, if he were here.

**[PROSECUTOR]:** [The defense counsel] asked if there had been any evident [sic] — actually, he made the statement there had been no efforts to corroborate and I think that there certainly were, and I think there certainly was, and I think there has — there was testimony both through direct and redirect and now in cross that indicates Mr. Vasquez's corroborating exactly what everybody else is corroborating.

**THE COURT:** Well, I don't think it opens the door to introduce Vasquez's statement beyond the extent that there has already been testimony to efforts to corroborate. I think that's a dangerous road to go down and certainly don't want to have a *Crawford*-related problem.

**[PROSECUTOR]:** I have gone as far as I intend to go in that regard. I just have a couple more.

**THE COURT:** All right.

**[DEFENSE COUNSEL]:** I understand. I had to make sure that didn't happen.

**THE COURT:** Okay. We will take just a real quick break, let the jurors finish up in there and then we will resume.

(Recess taken.)

(Jury present.)

**THE COURT:** Okay, pleased be seated.

**Q** Detective Ringer, you were able to corroborate the presence of Jose Hernandez at the scene?

**A** Yes.

**Q** And you were able to corroborate the presence of Santana Ocampo at the scene —

**A** Yes, we were.

Hernandez testified immediately after Detective Ringer and named Ocampo as the shooter. His testimony clarified that he had also named Ocampo as the shooter in his post-arrest statements to police.

Detective Webb testified shortly after Hernandez. Unlike Detective Ringer, he had spoken directly with Vasquez about the shooting. When he began to testify about that interview, the defense objected to some of the questions regarding Vazquez's interview:

**Q** Did Mr. Vasquez talk to you about the murder that occurred on August 10th?

**A** He did.

**Q**   Okay. Was he helpful as far as giving you information, or was he reluctant to talk?

**A**   Reluctantly helpful.

**Q**   Did he tell you the facts as he saw them and as he knew them about what had happened on August 10th?

**A**   He did.

**Q**   Were those facts consistent with —

**[DEFENSE COUNSEL]:** Your Honor, I am going to object here, we have a right to confront this witness.

**THE COURT:**   I am going to sustain to the question.

**[PROSECUTOR]:**   I was going to ask if his statement was consistent with other statements.

**[DEFENSE COUNSEL]:**   Your Honor, I —

**THE COURT:**   Sustained.

Other portions of Webb's testimony, however, did indicate that Vasquez had identified Ocampo as being present at the shooting. For example, in discussing how he came up with a list of clothing items for a search warrant for Ocampo's residence, Webb testified that he "solicited information from both Mr. Hernandez and Mr. Vasquez as to what everybody might have been wearing that night." Moreover, on redirect, Webb testified that he did not show a photo montage with Ocampo's photo to witnesses to the shooting in part because Vasquez had identified Ocampo as the shooter:

> **Q** Detective, you indicated that you didn't go back and show additional photo montages which included Santana Ocampo to witnesses after you got statements from Mesial Vasquez, after you got statements from Baldemar Vela and after you got statements from Jose Hernandez. Is that something that you would usually do when you have three eyewitnesses indicate the shooter is, do you then go around with pictures to —
>
> **[DEFENSE COUNSEL]:** Objection. Mischaracterizes the evidence.
>
> **THE COURT:** Sustain to the form of the question.
>
> **Q** Is there a reason you didn't go back later and show photo montages with Santana Ocampo to witnesses?
>
> **A** I would say we had a coconspirator that had confessed his involvement and *two additional witnesses* besides that person who implicated the defendant and we would focus then on that.

(Emphasis added).

The importance of the two detectives' testimony regarding Vasquez's interview was highlighted by the prosecution in closing arguments. The prosecution emphasized Vasquez's statements:

> The detectives didn't stop with Mr. Vela. They talked to Mesial Vasquez, it's my understanding they talked to him on August 27th about his whole scene and he confirmed Jose Hernandez. He was there driving back and forth, a shooting happened, all con-

> firmed by Mesial Vasquez, who at this point we don't know where he is. He's probably left the area.

And the prosecutor went on to argue "Ladies and gentlemen, Jose's gone back and forth to some extent about the facts of this, but his statements, *the core of his statements*, were corroborated by Mesial Vasquez, Baldemar Vela and Marcos[9], as well as physical evidence." (Emphasis added). The prosecutor also emphasized that "there is corroborating evidence that Jose Hernandez was being truthful," and that the one thing about which Hernandez had always been consistent was that Ocampo was the shooter. Finally, in its rebuttal, the prosecution argued that Jose Hernandez's testimony should leave the jury "convinced beyond a reasonable doubt [because] this . . . fourth guy in the car backs him up."[10]

Ocampo did not testify, but he presented several witnesses who testified that he was at the Quinceañera at the time of the shooting. The defense argued in closing that Hernandez killed Morales-Castro and was lying to save himself, Nick Solis, and, possibly, Vasquez. The jury, not persuaded, found Ocampo guilty of first-degree murder.

Ocampo appealed his conviction on the ground, among others, that his right to confrontation was denied by the two detectives' testimony regarding statements by Vasquez. Identifying *Crawford v. Washington*, 541 U.S. 36 (2004), as the

---

[9]Marcos is Jose Hernandez's older brother. He was not at the scene of the crime, but provided information to the detectives corroborating his brother's version of events. His trial testimony contained contradictions as to whether Ocampo was at the Quinceañera during the time that Hernandez was not. In closing, the defense argued that Marcos and Hernandez could easily have concocted their story together before each spoke to the police.

[10]The State never claimed anyone other than Vasquez was in the van with Ocampo, Hernandez, and Vela. So the context makes it clear that "fourth guy" refers to Vasquez. The prosecutor also referred to Vasquez as the fourth person in the van when questioning witnesses.

controlling authority, the Washington Court of Appeals held that "Ocampo [was] not entitled to a new trial based on this issue." Regarding Detective Ringer's testimony, the state appellate court noted that Ocampo did not object to that testimony, and cited *State v. Swan*, 790 P.2d 610, 635 (Wash. 1990) for the proposition that "[t]he absence of a motion for mistrial at the time of the argument strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial." The court of appeals also cited *State v. Lynn*, 835 P.2d 251, 254 (Wash. Ct. App. 1992), which requires a constitutional error raised for the first time on appeal to be manifest, and suggested that the Confrontation Clause error raised by Ocampo was not manifest because "Detective Ringer's testimony only implied the outlines of Vasquez's statement."

As to Detective Webb's testimony, the court held that there was no Confrontation Clause violation because "the detective did not testify to the substance of any statements Vasquez made." The court also noted that Ocampo was able to cross-examine Detective Webb on whether any statements were made.

Finally, as to the prosecutors' closing remarks focusing on what Vasquez had said, the court noted that Ocampo did not object to the remarks, citing *State v. Brown*, 940 P.2d 546, 564-65 (Wash. 1997), for the proposition that a "defendant's failure to object waives improper closing remarks unless the comments are so flagrant and ill-intentioned that the resulting prejudice could not be alleviated by a curative instruction." The Washington Supreme Court denied review.

Ocampo then filed a federal habeas petition raising several claims. Denying the petition, the district court reasoned, as to Ocampo's confrontation claim, that there was no Confrontation Clause problem, because (1) "no testimony as to the substance of any statements made by Mr. Vasquez" was presented by Detective Webb; (2) allowing Detective Ring-

er's testimony was not contrary to, or an unreasonable application of, clearly established Supreme Court law; and (3) the state court's decision regarding Detective Ringer's testimony was not based on an unreasonable determination of the facts.

On appeal, Ocampo pursues the Confrontation Clause claim alone.

## II.

Ocampo's petition was filed after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), and his claims were rejected by the state courts on the merits. So we may grant relief only if the last reasoned state decision was " 'based on an unreasonable determination of the facts in light of the evidence presented in [the] State court proceeding' " or on a legal determination that was " 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' " *Kennedy v. Lockyer*, 379 F.3d 1041, 1046 (9th Cir. 2004) (quoting 28 U.S.C. § 2254).

To meet the "unreasonable determination" standard under § 2254(d)(2), the habeas court "must be convinced that an appellate panel . . . could not reasonably conclude that the finding is supported by the record . . . [or] that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) (internal citations omitted). "[T]he state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Id.* at 1001.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The state court's decision must be "more than incorrect or erroneous"; it "must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). As the Supreme Court recently emphasized in *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770 (2011), " '[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.' " *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (alteration in original). " '[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.' " *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. ___, ___, 129 S. Ct. 1411, 1413-14 (2009)) (alteration in original). "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.*

## A.

**[1]** The merits of Ocampo's Confrontation Clause claim are governed by *Crawford*,[11] the Supreme Court's landmark

---

[11]It is possible to read the state appellate court's decision as rejecting Ocampo's confrontation claim, at least as to Detective Ringer's testimony, on the basis of a state procedural rule. But the State has not raised a procedural default defense to the Confrontation Clause claim either in the district court or here, and, in its briefing to us, it terms the state court's Confrontation Clause ruling as one "on the merits." The defense has therefore been waived. *See Franklin v. Johnson*, 290 F.3d 1223, 1230-31 (9th Cir. 2002). Although we have discretion to consider procedural default *sua sponte*, we do so only in extraordinary circumstances. *Slovik v. Yates*, 556 F.3d 747, 751-52 n.4 (9th Cir. 2009); *Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003); *Franklin*, 290 F.3d at 1233. There are no extraordinary circumstances in this case warranting *sua sponte* consideration.

decision construing the Sixth Amendment "right [of a criminal defendant] . . . to be confronted with the witnesses against him." *Crawford* held that the Clause forbids "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54.

**[2]** The state appellate court correctly identified *Crawford* as the controlling authority for Ocampo's Confrontation Clause claim. Our initial question, then is whether the state appellate court unreasonably applied *Crawford* to the facts of Ocampo's case. *See Williams*, 529 U.S. at 413. In addressing that question, we consider in turn three issues: first, whether Vasquez's statements to police were testimonial; second, whether those statements were admitted against Ocampo at trial; and third, whether the Confrontation Clause exception recognized in *Crawford* applies, i.e., whether, although Vasquez was unavailable to testify, Ocampo had had a prior opportunity to cross-examine him.

**1.**

Under *Crawford*, the admission of Vasquez's statements to the two detectives is not a Confrontation Clause violation unless those statements were testimonial. 541 U.S. at 53-54; *Davis v. Washington*, 547 U.S. 813, 821 (2006).[12] There is no question that they were.

**[3]** *Crawford* explained that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." 541 U.S. at 52. "Whatever

---

[12]*Davis* was decided two months after the state appellate court's decision in this case, but well before the Washington Supreme Court denied review. *Davis*, in any event, simply elucidates *Crawford*; it is *Crawford* that sets forth the governing clearly established Supreme Court precedent with regard to the basic coverage of the Confrontation Clause.

else the term ['testimonial'] covers, it applies at a minimum to . . . police interrogations." *Id.* at 68. On Ocampo's appeal, the state appellate court so acknowledged, stating that the definition of "testimonial . . . includes statements elicited in response to structured police questioning during an investigation." In *Davis*, the Supreme Court noted, similarly, that "[t]he product of such interrogation, whether reduced to writing . . . or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial." 547 U.S. at 826. Here, Vasquez's statements were made to detectives questioning him as part of their investigation into the events surrounding Morales-Castro's murder, and as such were undoubtedly testimonial.

**2.**

**[4]** The state appellate court implied that Vasquez's statements were not admitted against Ocampo at trial. Specifically, the state court stated that Detective Webb "did not testify to the substance of any statements Vasquez made," and that "Detective Ringer's testimony only implied the outlines of Vasquez's statement." We conclude that Ringer's testimony indisputably conveyed some of the critical substance of Vasquez's statements to the jury, in violation of the Confrontation Clause, even though his testimony was not detailed. We also hold that the state appellate court's factual understanding regarding the limited nature of Webb's testimony about Vasquez was objectively unreasonable under AEDPA, and that, reasonably understood, Webb's testimony concerning Vasquez violated the Confrontation Clause.

**(i)** We begin by considering the clearly established Supreme Court law regarding the degree of detail in which an out-of-court statement must be presented at trial to be covered by the Confrontation Clause. Our conclusion is that before *Crawford*, it was clearly established that testimony from which one could determine the critical content of the out-of-court statement was sufficient to trigger Confrontation Clause

concerns, and that, far from undermining that standard, *Crawford* established principles with which that aspect of the pre-*Crawford* Confrontation Clause jurisprudence are fully consistent.

**[5]** Before *Crawford*, the Supreme Court treated out-of-court statements as statements triggering the protections of the Confrontation Clause, even if the in-court testimony described rather than quoted the out-of-court statements: In *Idaho v. Wright*, 497 U.S. 805 (1990), the Court held that the trial court had violated the defendant's confrontation rights by allowing a pediatrician to describe a child's answers to his questions about sexual abuse from "notes [that] were not detailed." *Id.* at 811; *see id.* at 825-27. Also, both the Confrontation Clause and the hearsay rules cover "statements" offered as proof of a fact at trial, *Crawford*, 541 U.S. at 51-52; Fed R. Evid. 801(a) and (c), and both the constitutional confrontation assurance and the hearsay rules "protect similar values . . . and stem from the same roots." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980) (quotations omitted), *abrogated on other grounds by Crawford*, 541 U.S. 36. Before *Crawford*, the Court routinely considered descriptions of out-of-court statements, as well as questions or transcripts of them, as "statements" for hearsay rule purposes. *See, e.g.*, *Moore v. United States*, 429 U.S. 20 (1976); *Williamson v. United States*, 512 U.S. 594, 597 (1994). It was therefore clearly established Supreme Court law before *Crawford* that in-court descriptions of out-of-court statements, as well as verbatim accounts, are "statements" and can violate the Confrontation Clause, if the requisite requirements are otherwise met.

**[6]** *Crawford* altered Confrontation Clause law so that it generally covers "testimonial" out-of-court statements, 541 U.S. at 51-52, whether or not they "fall[ ] within a firmly rooted hearsay exception." *Roberts*, 448 U.S. at 66. But nothing in *Crawford* addressed, or undermined, the established principle that in-court testimony could trigger Confrontation Clause concerns by describing, but not quoting, an out-of-

court statement that would otherwise come within the Confrontation Clause.

**[7]** To the contrary, it would be an unreasonable application of the core Confrontation Clause principle underlying *Crawford* to allow police officers to testify to the substance of an unavailable witness's testimonial statements as long as they do so descriptively rather than verbatim or in detail. *Crawford*'s holding rests on the premise that "the use of *ex parte* examinations as evidence against the accused" was "the principal evil at which the Confrontation Clause was directed." 541 U.S. at 50. In applying this principle in *Davis*, the Court did "not think it [was] conceivable" that the Confrontation Clause could be interpreted to allow "a note-taking policeman [to] recite the unsworn hearsay testimony of the declarant." 547 U.S. at 826 (emphasis omitted). In other words, *Crawford* was concerned with ensuring that out-of-court testimonial statements, taken *ex parte* and without trial-like protections, were not used as evidence before the jury if the speaker could not be cross-examined. Permitting a police officer to summarize or outline an out-of-court statement in no way corrects for the affront to the purpose of the Clause, as it was explained in *Crawford*. The Confrontation Clause provides a procedural check on "[t]he involvement of government officers in the production of testimonial evidence." *Crawford*, 541 U.S. at 53. Where the government officers have not only "produced" the evidence, but then condensed it into a conclusory affirmation for purposes of presentation to the jury, the difficulties of testing the veracity of the source of the evidence are not lessened but exacerbated. With the language actually used by the out-of-court witness obscured, any clues to its truthfulness provided by that language — contradictions, hesitations, and other clues often used to test credibility — are lost, and instead, a veneer of objectivity conveyed.

Labeling such digested testimony as a mere "outline" of, rather than a description or summary of, the substance of out-

of-court statements cannot reasonably alter these conclusions or toss the testimony outside the reach of the Confrontation Clause as interpreted in *Crawford*.[13] Whatever locution is used, out-of-court statements admitted at trial are "statements" for the purpose of the Confrontation Clause both pre- and post-*Crawford* if, fairly read, they convey to the jury the substance of an out-of-court, testimonial statement of a witness who does not testify at trial.

**(ii)** In both non-AEDPA cases[14] and cases covered by AEDPA, several other circuits have applied the principle that

---

[13] *Mason v. Yarborough*, 447 F.3d 693 (9th Cir. 2006) suggested that, under *Crawford*, there is an open question as to whether testimony alluding to a non-testifying witness's statements violates the Confrontation Clause if the witness's words are never admitted into evidence, indicating that if a witness's "words were never admitted into evidence, he could not 'bear testimony' against [the defendant]." *Id.* at 696. But *Mason* did not decide this issue or engage in any substantive discussion of it. More importantly, the testimony in *Mason* alluded to the codefendant's statement without implicating Mason. "For all the jury knew, [the codefendant] confessed to his own involvement in the shootings and was arrested." *Id.* It was opaque evidence of that kind that *Mason* had in mind. Here, as explained in more detail below, Detectives Ringer and Webb testified regarding statements by Vasquez that, as described by the detectives, indisputably implicated Ocampo. Thus, the "bear testimony against" concern articulated in *Mason* has no application here.

Moreover, the recent Supreme Court decision in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009) undermines the reasoning in *Mason*. Specifically, in *Melendez-Diaz*, the Supreme Court clarified that "[t]he text of the [Sixth] Amendment contemplates two classes of witnesses — those against the defendant and those in his favor. The prosecution *must* produce the former; the defendant *may* call the latter. . . . [T]here is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation," noting that any other view "would be contrary to longstanding case law." *Id.* at 2534 (footnote omitted) (emphasis in original).

[14] We discuss several non-AEDPA cases because they express a general, consistent understanding of the reach of the Confrontation Clause, and so are at least informative as to whether a contrary view would be unreasonable.

testimony communicating the substance of absent witnesses' statements can run afoul of the Confrontation Clause even when there is no verbatim account of the out-of-court statement. The First Circuit recently held that "the right to cross-examine an out-of-court accuser applies with full force" even in circumstances where "the actual statements" of the out-of-court declarant were not admitted. *United States v. Meises*, ___ F.3d ___, 2011 WL 1817855 at *12 (1st Cir. May 13, 2011). Relying on *Crawford*, the First Circuit concluded that "[i]t makes no difference that the government took care not to introduce [the out-of-court declarant's] 'actual statements' " because "[t]he opportunity to cross-examine the declarant 'to tease out the truth,' *Crawford*, 541 U.S. at 67, is no less vital when a witness indirectly, but still unmistakeably, recounts a [declarant's] out-of-court accusation." *Id.* The First Circuit went on to reason that "if what the jury hears is, in substance, an untested, out-of-court accusation against the defendant, particularly if the inculpatory statement is made to law enforcement authorities, the defendant's Sixth Amendment right to confront the declarant is triggered." *Id.*

Other circuits agree. The Seventh Circuit, relying on *Crawford*, has recognized that allowing police to refer to the substance of witnesses' statements as they "narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment." *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004). Similarly, in *Favre v. Henderson*, 464 F.2d 359 (5th Cir. 1972), the Fifth Circuit held that the defendant's confrontation rights, as defined by the Supreme Court in *Dutton v. Evans*, 400 U.S. 74 (1970), were violated because "testimony was admitted which led to the clear and logical inference that out-of-court declarants believed and said that [the defendant] was guilty of the crime charged." *Favre*, 464 F.2d at 364. "Although the officer never testified to the exact statements made to him by the informers, the nature of the statements . . . was readily inferred." *Id.* at 362.

The Fifth Circuit has applied the same logic in at least one post-AEDPA habeas case: In *Taylor v. Cain*, 545 F.3d 327 (5th Cir. 2008), the Fifth Circuit relied on *Ohio v. Roberts* on the salient point in granting habeas in a case with facts similar to those here. The court held that "[p]olice officers cannot, through their trial testimony, refer to the substance of statements given to them by nontestifying witnesses in the course of their investigation, when those statements inculpate the defendant." *Id.* at 335.

In another post-AEDPA habeas case, the Second Circuit clarified that "[t]he relevant question is whether the way the prosecutor solicited the testimony made the source and content of the conversation clear." *Ryan v. Miller*, 303 F.3d 231, 250 (2d Cir. 2002). *Ryan* held that "[i]f the substance of the prohibited testimony is evident even though it was not introduced in the prohibited form, the testimony is still inadmissible" under the Supreme Court's Confrontation Clause precedents. *Id.* at 249.[15]

Finally, the Eleventh Circuit, relying on *Dutton*, also held, pre-AEDPA, that the Confrontation Clause is violated when police testify to the substance of inculpatory out-of-court statements. *Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir. 1983); *see id.* ("Although the officers' testimony may not have quoted the exact words of the informant, the nature and substance of the statements suggesting there was an eyewitness and what he knew was readily inferred").

---

[15]In an earlier, non-AEDPA case, the Second Circuit relied on the principle established in *Bruton v. United States*, 391 U.S. 123 (1968), in holding that testimony containing implicit accusations violates the Confrontation Clause even if the testimony does not "reveal[ ] in detail" the content of the out-of-court statements at issue. *Mason v. Scully*, 16 F.3d 38, 43 (2d Cir. 1994). *See also United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994) ("[A]lthough the jury was not told exactly what words [the co-defendants] had spoken, [the witnesses] testimony clearly conveyed the substance of what they had said").

**[8]** In sum, it is both clearly established Supreme Court law unaffected by *Crawford* and an unreasonable application of the rule adopted in *Crawford* to regard summarizing — or "outlining" — the substance of out-of-court testimonial statements, directly or in a way from which "the nature of the statement . . . [can be] readily inferred," *see Favre*, 464 F.2d at 362, as incapable of violating the Confrontation Clause. Instead, if the substance of an out-of-court testimonial statement is likely to be inferred by the jury, the statement is subject to the Confrontation Clause.

**[9] (iii)** Applying this principle, Detective Ringer's and Detective Webb's testimony concerning Vasquez's statements constituted the introduction of testimonial statements against Ocampo for Confrontation Clause purposes.

Detective Ringer testified about how the police identified the suspects in the shooting, which was in part by ruling out others, who had previously been identified by witnesses, as not having been involved. As to that process of identifying the suspects, Detective Ringer stated that "eventually Jose Hernandez was arrested, he gave a statement. Later we contacted Baldemar Vela, and he gave a statement that verified what Jose Hernandez said. And still later, Mesial Vasquez was interviewed and he also verified the other two." He repeated later that a "statement by Mesial Vasquez" was one reason he "knew" that some of the people identified as having been involved were not involved. The only fair reading of this testimony is that Vasquez stated that certain people were not suspects, but did not so state concerning Ocampo. Vasquez's out-of-court statement exonerating others who had been identified from photographs as involved in the crime, but not Ocampo, was inculpatory as to Ocampo, as it indicated that Vasquez, who was present, did not exonerate Ocampo. Further, as there were only four people in the car, and Ocampo's defense was that he was not one of them, eliminating some suspects from among those identified by witnesses was itself of importance, as it made it less likely that someone other than Ocampo was

one of the four people in the car. As the prosecutor later said in closing, central to the case was "whether the defendant was there or whether it was someone else there."

Later, Detective Ringer testified that he had corroborated Hernandez's participation in the shooting in part through statements made by Vasquez, and went on to say that he had also corroborated Ocampo's presence at the scene, although he did not give any details about how he had corroborated Ocampo's presence. Immediately after Ringer testified, Jose Hernandez testified that Ocampo was the shooter.[16] Corroborating Hernandez's participation thus helped to inculpate Ocampo, as it was a link in the chain of evidence that gave credence to Hernandez's identification of Ocampo as the shooter. If the jury had had only Hernandez's word that he himself was involved in the crime, then it could have had a harder time believing his overall story about how the crime occurred.

In sum, Ringer's testimony did not provide any specific details about Vasquez's out-of-court statements. But it did convey some critical substance about those statements: That certain others were not among those present at the scene, that Ocampo was not among those identified as not present, and that Hernandez was a participant in the shooting. All together, Ringer's testimony indicated that Vasquez had confirmed Ocampo's presence at the scene of the crime. The State recognized as much in its brief: "Detective Ringer's testimony did not relate any of the substance of Vasquez's statements *other than Ocampo's presence there*." (Emphasis added). And that presence was the key issue in the case, as Ocampo's defense was that he was not there.

More specific than Ringer's testimony about Vasquez's statements to the police was Detective Webb's testimony

---

[16]Hernandez also testified that his testimony at trial was consistent with his initial post-arrest statements to police.

about those statements. While Ringer had not personally spoken with Vasquez, Detective Webb had. He testified that Vasquez talked to him about the murder and was "reluctantly helpful." Webb then went on to testify that he came up with a list of clothing items to search for at Ocampo's residence based in part on information solicited from Vasquez "as to what everybody might have been wearing that night." Finally, and most importantly, Webb testified that he "didn't go back later and show photo montages with Santana Ocampo to witnesses" because "a coconspirator . . . had confessed his involvement and *two additional witnesses* besides that person [had] *implicated the defendant*." (Emphasis added). It was clear from the context of the prosecutor's previous question, to which an objection had been sustained, and from the other evidence at the trial that the "two additional witnesses" had to be Vela and Vasquez.

The Washington Court of Appeals' determination that Detective Webb "did not testify to the substance of any statements Vasquez made," was thus either legally or factually unreasonable. To the extent that the Court of Appeals meant that the testimony was not to the "substance" of Vasquez's statements because it was in summary form and not in detail, the conclusion was legally unreasonable given clearly established Supreme Court law, for the reasons already surveyed. To the extent the Court of Appeals ignored that the "two additional witnesses," in context, necessarily included Vasquez, or that testimony that Vasquez's statement "implicated" Ocampo contains critically important substance, its conclusion was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2); *see also Taylor*, 366 F.3d at 1001 ("the state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim").

Were there any doubt as to what a jury would have understood about Vasquez's out-of-court statements from the two detectives' testimony — which we do not think there is — it

is dispelled by the prosecutor's remarks at closing. Those remarks highlighted the testimony about Vasquez's statements as critically important, stressing that "the core of [Hernandez's] statements" — which were that Ocampo was present and was the shooter — "were corroborated by Mesial Vasquez . . . ." As in *Hutchins*, "the prosecutor's reliance on the hearsay testimony in closing argument was such that a reasonable juror could have concluded only that [Vasquez] identified [Ocampo] as the perpetrator." 715 F.2d at 516.

**[10]** In sum, the critical substance of Vasquez's testimonial statements were admitted against Ocampo at trial, albeit not in verbatim form, through Detective Ringer's and Detective Webb's testimony. The prosecutor's closing argument then framed for the jury precisely what they were meant to take from the detective's testimony about Vasquez: that he had confirmed both Ocampo's presence that night and that Ocampo was the shooter. The state appellate court's conclusion to the contrary, premised on its characterization of the detectives' testimony as only "outline" or lacking "substance," was an unreasonable application of clearly established Supreme Court precedent.

### 3.

Under *Crawford*, testimonial statements may be admitted if the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine him. 541 U.S. at 53-54. This exception has no application here, whether or not Vasquez was actually unavailable, as Ocampo never had an opportunity to cross-examine Vasquez.

*Crawford* held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability *and* a prior opportunity for cross-examination." *Id.* at 68 (emphasis added). This conclusion rested on the premise that the Confrontation Clause "commands, not that evidence be reliable, but that reliability be

assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61. As a result, "the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 69.

**[11]** Although the Washington Court of Appeals suggested otherwise, this confrontation requirement was not satisfied by the fact that "Ocampo was able to cross-examine the detective[s] on whether any statements were made." *Crawford* was emphatic that questioning an in-court witness who relates the statements of an absent witness is no substitute for the direct confrontation guaranteed by the Sixth Amendment, noting, for example, that Sir Walter Raleigh was denied his right to confront his accuser despite being "perfectly free to confront those who read [the accuser's] confession in court." *Id.* at 51; *see also Davis*, 547 U.S. at 826 (having a police officer stand in for an absent witness is not "conceivable"). Without doubt, the proposition that the opportunity to cross-examine an in-court witness about an out-of-court testimonial statement by an absent witness is sufficient is contrary to clearly established Supreme Court law.

**[12]** The state court admitted the critical substance of Vasquez's testimonial statements against Ocampo, and, because Vasquez did not testify, Ocampo had no opportunity to cross-examine Vasquez. Ocampo's federal constitutional right to confront the witnesses against him was therefore violated. The state appellate court's decision holding otherwise was an objectively unreasonable application of *Crawford*.

### B.

**[13]** We now turn to whether the Confrontation Clause violation at Ocampo's trial requires the issuance of a writ of habeas corpus. A Confrontation Clause violation is harmless, and so does not justify habeas relief, unless it " 'had substantial and injurious effect or influence in determining the jury's

verdict.' "[17] *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "[W]hen a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).

In general, the inquiry into whether the constitutionally erroneous introduction of a piece of evidence had a substantial and injurious effect is guided by several factors: "the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case." *Whelchel v. Washington*, 232 F.3d 1197, 1206 (9th Cir. 2000) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)); *accord Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009). As to the weight given to corroborating testimony in Confrontation Clause cases, we have explained that:

> While corroborative evidence may, as a general rule, make the wrongful introduction of other evidence harmless, this concept has no application where: (1) there was a reason for the jury to doubt the only eyewitness testimony; (2) the third party testimony was not exceptionally strong; and (3) the physical evidence connecting the accused to the crime was limited and explained by [the defendant's theory of the case].

---

[17]The Washington Court of Appeals did not make a harmlessness determination under *Chapman v. California*, 386 U.S. 18 (1967). Even if it had, our analysis would still be governed by the *Brecht* standard. *See Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010) (holding that after *Fry v. Pliler*, 551 U.S. 112 (2007), "we need not conduct an analysis under AEDPA of whether the state court's harmlessness determination . . . was contrary to or an unreasonable application of clearly established federal law," but should instead apply the *Brecht* standard "without regard for the state court's harmlessness determination").

*Whelchel*, 232 F.3d at 1208.

Applying these factors, we conclude that the admission of Detective Ringer's and Detective Webb's testimony regarding Vasquez's statements, in combination with the prosecutor's closing remarks, had "a substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 623.

First, the importance of Vasquez's statements was underscored by the prosecutor's several references to Vasquez's out-of-court statements in closing argument.[18] Moreover, as discussed above, the prosecutor framed the detectives' testimony about Vasquez's statements in such a way that the jury was encouraged to conclude, as it probably would have anyway, that Vasquez had identified Ocampo as the shooter. *See Hutchins*, 715 F.2d at 516.

For example, the prosecutor accurately identified a central issue in the case as being "whether the defendant was there or whether it was someone else there." She then minimized the importance of Vela's equivocations on the stand about whether he could identify Ocampo as one of the people in the car by reminding the jury that Hernandez's testimony was also "all confirmed by Mesial Vasquez." Similarly, the prosecutor urged the jury to ignore the fact that Hernandez had "gone back and forth to some extent about the facts," because "the core of his statements, were corroborated by Mesial Vasquez." In her rebuttal the prosecutor told the jury they should be "convinced beyond a reasonable doubt" that Jose Hernandez was a participant in the events as he reported,

---

[18]Our purpose in recounting the prosecutor's use of Vasquez's statements in closing argument is not to treat that argument as itself constitutional error. Instead, the argument serves both to confirm the importance of the testimony as to Vasquez's statements, given the evidence as a whole, as well as to confirm how the jury most likely understood those statements.

"[b]ecause . . . this . . . fourth guy in the car [Vasquez] backs him up."

Second, without Vasquez's statements corroborating Hernandez's version of events, the evidence implicating Ocampo as the shooter could well have been disbelieved. The other two people present in the car, Hernandez and Vela, gave testimony that was internally contradictory, inconsistent with each other's, and indeterminate.

To begin, there were structural reasons "for the jury to doubt" the testimony of Hernandez, the only eyewitness to the shooting. *See Whelchel*, 232 F.3d at 1208. Hernandez was an accomplice. The Supreme Court has long recognized that accomplices are questionable witnesses. *See Crawford v. United States*, 212 U.S. 183, 204 (1909) (admonishing that "the evidence of such a witness ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses"). The jury instructions in this case included a standard accomplice instruction, which the prosecution discussed in closing argument, warning the jury that Hernandez's statements should be viewed with "great caution." Moreover, Hernandez's plea agreement was predicated on testifying against Ocampo, so he would have been risking additional punishment had he not testified that Ocampo was responsible for the murder. *Cf. Whelchel*, 232 F.3d at 1207-08. After acknowledging these weaknesses inherent in Hernandez's testimony, the prosecutor once more stressed that "there is corroborating evidence that Jose Hernandez was being truthful."

Another reason "for the jury to doubt" Hernandez's testimony was that it was inconsistent in several respects with his pre-trial version of events. On cross-examination, the defense impeached Hernandez with several inconsistencies between his testimony and his taped post-arrest statement to the police, including inconsistencies about how he got to the Quinceañ-

era; whether Vela bought beer for him before the shooting; whether he saw the gun after the shooting; how long he stayed at the Quinceañera after the shooting; who he left with; and where he went. Hernandez had no real explanation for these inconsistencies, and instead insisted, implausibly, that the transcript of his taped statement was incorrect.

Yet another reason the jury could well have disbelieved Hernandez's basic story inculpating Ocampo was that other witnesses contradicted Hernandez's testimony as to central facts. For example, although Hernandez testified that only he and Ocampo fled from Morales-Castro's car to Vela's van after the shooting, the other witnesses at the scene uniformly testified that they saw a group of three individuals fleeing. Hernandez maintained that Morales-Castro acted drunk and smelled of alcohol when entering his car, but there were no drugs or alcohol in Morales-Castro's system when he was admitted to the hospital. And Hernandez's story was that after the shooting, he was in the back seat of the van with Vasquez, while Ocampo sat up front with Vela. Vela, in contrast, testified that Hernandez was in the front seat, and that someone in the back of the van confessed to being the shooter. If Hernandez was correct about where Ocampo sat then, according to Vela, Ocampo was not the shooter.

There was yet one more, exceedingly strong reason for disbelieving Hernandez's account of the crime: Hernandez twice confessed to juvenile detention officers that *he*, not Ocampo, was the shooter that night. And Hernandez's ex-girlfriend also testified that Hernandez had told her that he had shot Morales-Castro.[19] Absent a strong reason to disbelieve Ocampo's alibi, a reasonable jury could have chosen to believe Hernandez's confession and to conclude that he had made up the story that Ocampo was both present and the shooter so as to obtain a favorable plea agreement.

---

[19]For various reasons, including her age and drug use, Hernandez's ex-girlfriend may not have been the most credible witness.

Nor was the third-party testimony the prosecution offered "exceptionally strong." *Cf. Whelchel*, 232 F.3d at 1208. The only prosecution witness other than Hernandez who ever claimed to see Ocampo at the scene was Vela. But Vela testified on cross-examination that he did not actually know who the passengers in his van were, and only identified Ocampo in his interview with police as a passenger after he was told that Ocampo had already confessed to being in the van. Also, Detective Ringer admitted that the use of a single, color Polaroid of Ocampo in seeking Vela's identification was a potentially suggestive method for obtaining a reliable identification.

Furthermore, the conflict between the testimony of Vela and Hernandez about seating positions is crucial: While Vela represented that Hernandez was in the front passenger seat as they left the scene, Hernandez's story was that he, Hernandez, was sitting in the back. Thus, either Hernandez's statement is true and there is a 50% chance Hernandez was the source of the inculpatory statement, testified to by Vela — "I was tripping, so I had to shoot him," — or Vela's statement is true — that is, Herandez was sitting in the front — and there is yet another factual inaccuracy undermining Hernandez's testimony.

Finally, the physical evidence "was limited and explained by" Ocampo's theory of the case. *Cf. Whelchel*, 232 F.3d at 1208. In closing argument, the prosecution offered clothing found in Ocampo's room and the ballistics of Morales-Castro's gunshot wound as "physical evidence," arguing that both were consistent with Hernandez's account. But neither piece of evidence conforms, or even corroborates, that Ocampo was the shooter. Even if the clothes found in Ocampo's room were the very ones that Hernandez saw him wearing that night, that only proves that Hernandez saw him at some point that evening. And the consistency between Morales-Castro's wound and Hernandez's description of the incident only strengthens Hernandez's claim that he witnessed

the shooting. It says nothing about whether Ocampo was the one he saw pull the trigger, or whether, instead, it was Hernandez himself (as he had told three people at three different times), or a third person (for example, Vasquez or Solis).

**[14]** In sum, the overall case against Ocampo was as far as can be from "overwhelming." *Cf. Moses v. Payne*, 555 F.3d 742, 755 (9th Cir. 2009) (constitutional error does not warrant reversal when there is "overwhelming evidence" of the defendant's guilt). The "physical" evidence the State offered only had significance in showing that several ancillary aspects of Hernandez's testimony (from where the shot was fired and what clothes Ocampo owned) were not demonstrably false. The prosecutor acknowledged that *the* issue in the trial was whether it was Ocampo or someone else who was with Hernandez when Morales-Castro was shot. And the only evidence of witnesses who testified at trial linking Ocampo to the scene came from Hernandez and Vela. The jury had several, weighty reasons to disbelieve Hernandez, and Vela was far from sure of his identification of Ocampo and did not directly link Ocampo to the shooting.

**[15]** Given these considerable weaknesses in the prosecution's case, the testimony regarding Vasquez's statements, emphasized by the prosecutor's references to Vasquez at closing, cut to the heart of Ocampo's defense, which was that he had never left the Quinceañera. Vasquez's out-of-court testimonial statements, as testified to by Detectives Ringer and Webb, indicated that Ocampo was present at the scene of the crime, and, indeed was "implicated" in the shooting. The prosecution — like the trial judge — was obviously aware that *Crawford* restricted its ability to rely on Vasquez's out-of-court statements, yet, as the repeated references to that statement in the prosecution's closing comments to the jury confirm, without the core of those statements — that Ocampo was present at the scene of the crime and involved in it — there might well have been no conviction. The prosecution therefore tried to walk a fine — indeed, non-existent — line

between conveying to the jury that Vasquez confirmed Hernandez's story and avoiding a Confrontation Clause violation. It succeeded as to the first but, for that very reason, failed under clearly established Supreme Court law as to the second.

We, of course, cannot know whether, had Vasquez testified, he would have confirmed Hernandez's story regarding Ocampo's role in the crime or whether he would have been exposed as a possible liar through effective cross-examination. For present purposes, however, what matters is that he did not appear at trial; his statements thus should not have been admitted at all, whether in "outline," summary, unavoidable inference, or verbatim; and, given the weakness of the two other key trial witnesses and of the physical evidence, we necessarily have "grave doubt" that without Detectives Ringer and Webb's accounts of what Vasquez said, the result would have been a conviction of Ocampo. *See O'Neal*, 513 U.S. at 435. When a court is thus "in virtual equipoise as to the harmlessness of the error under the *Brecht* standard, the court should treat the error as if it affected the verdict." *Fry*, 551 U.S. at 121 n.3 (citations and quotations omitted). We conclude that the erroneous admission of the substance of Vasquez's statements to police, given particular force for the jury by the prosecutor's repeated references to those statements in closing, was prejudicial under the *Brecht* standard.

## III.

[16] The Washington Court of Appeals unreasonably applied clearly established Supreme Court Confrontation Clause jurisprudence to the facts of this case. The error was prejudicial because the testimony concerning Vasquez's out-of-court statements to the two detectives bolstered the state's weak case against Ocampo, and flatly contradicted Ocampo's alibi defense. We reverse the district court's denial of Ocampo's petition for writ of habeas corpus and remand with instructions to grant a writ of habeas corpus unless the State

elects to retry Ocampo within a reasonable amount of time to be determined by the district court.

**REVERSED and REMANDED.**