Daemont WHEELER, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 365, 2011.

Supreme Court of Delaware.

Submitted: Jan. 11, 2012.
Decided: Feb. 7, 2012.

**312**

Bernard J. O'Donnell, Esquire, Office of the Public Defender, Wilmington, Delaware, for appellant.

John Williams, Esquire, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

HOLLAND, Justice:

Following a jury trial in the Superior Court, the defendant-appellant, Daemont Wheeler ("Wheeler"), was convicted of Attempted Murder in the First Degree, Possession of a Firearm During the Commission of a Felony, Possession of a Firearm by a Person Prohibited, and Possession of Ammunition by a Person Prohibited. The State's motion to have Wheeler sentenced as an habitual offender was granted. He was sentenced to natural life imprisonment for Attempted Murder in the First Degree, and was sentenced to thirty-eight years of imprisonment at Level 5 for the remaining offenses.

In this direct appeal, Wheeler argues that his Sixth Amendment right to confrontation was violated when the Superior Court admitted into evidence hearsay statements by persons who did not testify at the trial. Wheeler's argument raises two distinct questions: whether the testimony presented violated the hearsay rule and whether that testimony violated the Sixth Amendment's Confrontation Clause. We have concluded that both questions must be answered in the affirmative. We have also concluded, however, that the erroneous admission of the testimonial hearsay evidence was harmless. Therefore, the judgments of the Superior Court must be affirmed.

*Facts*

On November 13, 2009, Herbie Davis was shot in the back and leg several times while he was in the kitchen of Tricia Scott's home near Dover. Davis lived in Wilmington but stayed at Scott's home occasionally and considered her his fiancée. Davis and Scott were planning on Davis moving into her home. Several of Tricia Scott's children, including Shani and Amber, and grandchildren, also lived with her.

Wheeler was Amber's boyfriend and frequently stayed in Amber's bedroom in the basement of Scott's home. In 2009, Amber gave birth to a baby, fathered by Wheeler. Davis testified that he and Wheeler did not get along after Davis told Wheeler that he should get a job to help support Amber, the baby, and the household.

Davis testified that shortly before the shooting on November 13, 2009, Wheeler had been downstairs with Amber. Davis and Shani were in the kitchen area. When Wheeler came upstairs, he had a disagreeable exchange with Davis before Wheeler walked out the back door. Davis then went out the front door to smoke a cigarette and returned several minutes later.

Davis testified that after he returned and was talking with Shani in the kitchen area, Wheeler came up behind him and

shot him several times [1] after saying, "I really don't like you." After shooting Davis, Wheeler fled. Davis fell to the kitchen floor and told Shani that he could not feel his legs. Shani called 911 and applied pressure to Davis' leg. When Amber rushed upstairs to the kitchen, after hearing the gun shots, Shani told her: "Daemont just shot Herbie—Mr. Herbie."

At 8:55 p.m. on November 13, 2009, Delaware State Police Corporal Thomas Lamon was dispatched to investigate a report that someone had been shot. Corporal Lamon was the first police officer to arrive at Trisha Scott's home. When Corporal Lamon entered the residence, he saw Davis on the kitchen floor surrounded by blood. Shani was kneeling over Davis. Corporal Lamon testified that Davis and Shani were the only people in the kitchen, and that Shani "was clearly upset, shaken." Davis told Corporal Lamon, "Daemont shot me."

Delaware State Police Detective Mark Ryde was the chief investigating officer. When he arrived at the Scott residence, Detective Ryde conducted separate recorded interviews of Trisha Scott's two daughters, Shani and Amber. Those interviews were conducted in Detective Ryde's police car.

After the on-scene investigation concluded, Detective Ryde attempted to locate the suspect, Wheeler. After Detective Ryde was unable to locate Wheeler at two addresses, he prepared an arrest warrant. That arrest warrant was placed in the National Crime Index Center database.

On November 23, 2009, Detective Ryde received information that Wheeler might be at a certain apartment in Harrington, Delaware. The apartment house was owned by Mary Zachery. Detective Ryde obtained a search warrant. Inside the unoccupied apartment, Detective Ryde found a document and prescription medication with Wheeler's name. Later, Detective Ryde conducted an unrecorded interview of Mary Zachery at State Police Troop No. 3.

In January 2010, in an effort to locate Wheeler, Detective Ryde contacted the United States Marshall's Task Force. Wheeler was apprehended on January 27, 2010, in Wayne County, Michigan. After waiving an extradition hearing, Wheeler was returned to Delaware on February 17, 2010.

At trial, in April 2011, Wheeler elected not to testify, and the defense rested without presenting any witnesses.

### Victim's Eyewitness Identification

The first witness at Wheeler's trial was the shooting victim, Davis. During his direct examination, Davis identified Wheeler for the jury as the man who came from behind and shot him multiple times while Davis was standing in the kitchen of Tricia Scott's home talking to Shani. Davis turned around after he was shot. He testified: "I seen his face. I seen the gun," which was described as a silver semi-automatic. Davis also testified that he recognized Wheeler's voice and that before the shooting, Davis heard Wheeler shout "I really don't like you." Davis repeated his identification of Wheeler as the shooter at several other points during his direct testimony. For example, Davis testified that he had immediately identified Davis as the shooter to Trooper Lamon when the trooper arrived at the scene and found Davis wounded on the kitchen floor. On cross-

---

1. At the shooting scene, the Delaware State Police Detective found a total of six shell casings. A forensic firearms examiner testified that the six shell casings were all fired from the same weapon, a 9 mm semiautomatic.

examination, Davis added: "I knew who shot me," and "I seen him shoot me. . . ."

### Victim Relates Excited Utterance

Davis also testified that after he was shot, Amber Scott immediately came upstairs to the kitchen from the basement. According to Davis, Shani Scott told Amber that "Daemont just shot Herbie—Mr. Herbie." Defense counsel raised a hearsay objection to Davis relating what eyewitness Shani Scott told her sister, Amber. Herbie Davis also testified without objection that Shani Scott told the troopers who first arrived at the scene that Wheeler had shot Davis. Those statements are not at issue in this appeal. The trial judge overruled the objection stating: "Well, I think that would qualify as a present sense reaction to what the scene was at the time." When the prosecutor added that Shani's statement to her sister immediately after the shooting also qualified for admission as an excited utterance, the trial judge agreed.

■ The State argues that the trial judge did not abuse his discretion in overruling the defense trial hearsay objection and permitting the shooting victim, Davis, to state what the second eyewitness, Shani Scott, told Amber had occurred. We agree. Present sense impression and excited utterance are both well recognized exceptions to the general evidentiary rule against hearsay.[2]

■ A witness's statement made during or immediately after an event qualifies as a present sense impression that is admissible at trial even though the declarant may be unavailable for cross-examination.[3] The declarant, Shani Scott, was physically present in her mother's kitchen when Wheeler shot Davis. Apparently hearing the gunshots, Amber Scott rushed up from the basement after Wheeler fled the house. Shani's statement to Amber identifying Wheeler as the shooter was a personal perception by an eyewitness describing the event and made immediately after the shooting.[4]

■ An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[5] In order to qualify as an excited utterance: the excitement of the declarant must have been precipitated by an event; the statement being offered as evidence must have been made during the time period while the excitement of the event was continuing; and the statement must be related to the startling event.[6]

■ Shani's statement to Amber satisfied the three requirements for an excited utterance: the shooting of Davis by Wheeler precipitated Shani's excitement; the statement identifying the shooter was made during the time the excitement of the event was continuing; and Shani's statement was related to the startling

---

**2.** See Del. R. Evid. 802; Del. R. Evid. 803(1), (2).

**3.** Del. R. Evid. 803(1) ("A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.")

**4.** See Warren v. State, 774 A.2d 246, 251 (Del. 2001). See also Archy v. State, 976 A.2d 170, 2009 WL 1913582, at *3–4 (Del. July 6, 2009);

Washington v. State, 945 A.2d 1168, 2008 WL 697591, at *2 (Del. Mar. 17, 2008); Green v. St. Francis Hosp., Inc., 791 A.2d 731, 735–36 (Del.2002).

**5.** Del. R. Evid. 803(2).

**6.** Gannon v. State, 704 A.2d 272, 274 (Del. 1998) (citation omitted).

event.[7] An excited utterance is deemed to be reliable because the declarant is excited by the startling event and does not have an opportunity to fabricate a response.[8]

Under the circumstances of the shooting in her mother's kitchen, Shani Scott's statement to her sister Amber that "Daemont just shot Herbie—Mr. Herbie" was properly admissible as a present sense impression under Delaware Uniform Rule of Evidence ("D.R.E.") 803(1) and also as an excited utterance under D.R.E. 803(2). There was no abuse of discretion in the trial judge's admission of Shani's statement to Amber as related by the victim, Davis.

### Detective Ryde's Testimony

In support of its case against Wheeler, the State introduced into evidence the substance of out-of-court statements by three witnesses who were unavailable to testify at trial: Shani Scott, Amber Scott, and Mary Zachery. Shani Scott was with Davis when the shooting occurred and Amber Scott was downstairs in the basement. Mary Zachery, Wheeler's landlord at a rooming house, was not present at the crime scene.

Detective Ryde took statements from Shani and Amber approximately two hours after the shooting, in a police vehicle outside of Tricia Scott's residence. Mary Zachery's statement was taken at a later time. Over a defense objection, the prosecutor asked Detective Ryde if, after interviewing Shani Scott for a recorded statement, "did you have any reason to believe that a suspect other than the defendant was involved?" Detective Ryde responded "no." The prosecutor then asked, "[w]as she [Shani] able to provide you with the specific words that were exchanged be-

tween Herbie and the defendant that she recalled hearing?" Detective Ryde answered, "Yes."

Amber Scott was with Wheeler immediately before the shooting and rushed upstairs to the kitchen after the shooting. The prosecutor asked Detective Ryde whether Amber Scott provided him any information about what had occurred in the Scott residence that night. After acknowledging that Amber had, Detective Ryde was asked whether after speaking with Amber, he had any reason to believe that any suspect other than Wheeler was involved with the shooting. Detective Ryde responded that he did not.

Mary Zachery had been Wheeler's landlord. The prosecutor asked Detective Ryde if Mary Zachery had any pertinent information to provide concerning the shooting. Over a defense objection, Detective Ryde was permitted to answer that she did, and that based on that information, he had no reason to believe that any person other than Wheeler was involved in the shooting.

### Indirect Hearsay Evidence

Shani Scott, Amber Scott, and Mary Zachery were asked questions by Detective Ryde that were similar in format. Each question was the subject of a defense objection at trial that was overruled. In each instance, the chief investigating officer, Detective Ryde, was asked by the prosecutor if after speaking with a particular named witness, he had any reason to believe that any suspect other than Wheeler was involved in the 2009 shooting of Davis.

Wheeler's focus is on the significance of the prosecutor's line of questioning and whether or not these witnesses' interviews

7. *See Brodie v. State*, 16 A.3d 937, 2011 WL 927673, at *2 (Del. Mar. 17, 2011).

8. *See Pressey v. State*, 25 A.3d 756, 758–59 (Del.2011).

gave Detective Ryde reason to suspect anyone other than Wheeler. Wheeler argues that the form of the prosecutor's question reflected that the non-testifying witnesses had named Wheeler as the shooter. Because Wheeler had been identified as the only suspect *before* the three interviews, Wheeler contends the prosecutor's intention was to show that authorities had no reason to suspect anyone but Wheeler *after* the interviews. Wheeler submits that the State's line of questioning connected the "pertinent" information the witnesses gave to police about the shooting and the witnesses' statements that Wheeler was the shooter.

Accordingly, Wheeler argues that "the prosecutor was permitted to do indirectly what he could not do directly, incriminate [him] based on the hearsay investigative statement" of three unavailable trial witnesses. The State submits that the questioning by the prosecutor purposely avoided asking Detective Ryde directly what the three unavailable witnesses said verbatim, and that by doing so, the State did not attempt to introduce any hearsay evidence as prohibited by D.R.E. 802. Wheeler argues that the three negative responses by Detective Ryde to the same type of question incriminated Wheeler by placing the substance of the three unavailable witnesses' inadmissible hearsay statements before the jury.

■ The facts in this case are similar to those presented in *United States v. Meises*.[9] In *Meises*, in the pertinent portion of the challenged exchange, Agent Cruz was asked if a witness named Rubis had said anything during his interview that changed the targets of the investigation and prompted the defendants' arrests. Agent Cruz answered affirmatively. The government argued that the prosecutor's examination was "adroitly focused ... on the actions that Agent Cruz took after speaking to Rubis ...."[10] The appellants argued that "[n]o juror of normal intelligence, hearing this exchange, could have failed to get the prosecutor's point that Rubis, in his statement to the agents, had implicated [the defendant] as a co-conspirator."[11]

The appellants in *Meises* contended that "the import of this testimony is no less clear than if Rubis had been directly quoted."[12] The First Circuit agreed with appellants that a "reasonable jury could only have understood Cruz to have communicated that Rubis had identified appellants as participants in the drug deal."[13] The First Circuit held that it made no difference that the government took care not to introduce Rubis's "actual statements."[14]

In *Mitchell v. Hoke*,[15] the prosecution attempted to avoid the hearsay rule by not asking a detective whom the unavailable witness had identified in a lineup. Instead, the detective was asked if the unavailable witness identified anyone in the lineup and whether he made an arrest as a result of that identification.[16] The detective answered both questions in the affirmative and named the defendant as the

---

9. *United States v. Meises*, 645 F.3d 5 (1st Cir.2011).

10. *Id.* at 21.

11. *Id.*

12. *Id.*

13. *Id.*

14. *Id.*

15. *Mitchell v. Hoke*, 745 F.Supp. 874 (E.D.N.Y.1990), *aff'd* 930 F.2d 1 (2d Cir. 1991).

16. *Id.* at 875–76.

man whom he had arrested.[17] Judge Weinstein characterized that evidence as a classic example of indirect hearsay: the testimony of the listener (detective) leads by direct inference to the precise words of the unavailable speaker (the identifying witness).[18] Under those circumstances, since the speaker's credibility must be evaluated to determine the truthfulness of the evidence, the hearsay rule applies.[19]

In Wheeler's case, the State attempted to avoid the hearsay rule by not asking Detective Ryde directly whether each of the three witnesses said that they believed Wheeler shot Davis. Instead, Detective Ryde was asked if anyone other than Wheeler was identified by each of the three witnesses. As Judge Weinstein held in *Mitchell,* that is a distinction without a legal difference for purposes of a hearsay analysis.[20]

Detective Ryde's testimony is also a classic example of indirect hearsay. In Wheeler's case, as in *Meises* and *Mitchell,* the jury could only draw one reasonable inference from Detective Ryde's testimony: that each witness identified Wheeler as the perpetrator. Detective Ryde, in effect, repeated the substance of the three unavailable witnesses' statements to him. That indirect hearsay testimony was offered by the State to prove the truth of the matter asserted. Accordingly, we hold that the hearsay rule was violated.[21]

## Confrontation Clause

■ The next question to be addressed is whether the introduction of Detective Ryde's inadmissible hearsay testimony violated the Confrontation Clause of the Sixth Amendment. The Confrontation Clause guarantees criminal defendants the benefit of "the principal means by which the believability of a witness and the truth of his testimony are tested," [22] subjecting that testimony to "the crucible of cross-examination." [23] Wheeler argues that the admission into evidence the substance of statements made by Shani, Amber, and Mary to Detective Ryde violated his Sixth Amendment right to confront the witnesses who were his accusers.

In *Crawford v. Washington* [24] and *Davis v. Washington,*[25] the United States Supreme Court established a framework for analyzing whether the introduction of out-of-court statements of witnesses who do not testify at trial violates a defendant's Sixth Amendment right to confront those witnesses. A threshold requirement of the *Crawford* Confrontation Clause analysis is that the testimony at issue introduces hearsay, *i.e.,* an out-of-court *statement* introduced at trial to prove the truth of the matter at issue.[26] We have already held that the admission of Detective Ryde's testimony constituted indirect hearsay evidence that was prohibited by D.R.E. 802.

■ In *Crawford,* the Supreme Court held that the Confrontation Clause prohibits the "admission of *testimonial* state-

17. *Id.*

18. *Id.* at 876.

19. *Id.*

20. *Id.*

21. Del. R. Evid. 802.

22. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

23. *Crawford v. Washington,* 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

24. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

25. *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

26. Del. R. Evid. 801(c).

ments of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."[27] A statement is "testimonial" if it is provided during an investigation for the purpose of fact gathering for a future criminal prosecution.[28] The Supreme Court held that "interrogations by law enforcement officers fall squarely within [this] class."[29] In *Davis v. Washington*, the Supreme Court further explained that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[30]

Wheeler argues that the hearsay statements obtained by Detective Ryde as the chief investigating officer were testimonial statements that he took in discharging his responsibility to manage the investigation of the Davis shooting for later prosecution. Therefore, Wheeler argues that the admission of the substance of these hearsay statements at trial, in the absence of any opportunity to cross-examine the unavailable declarants, violated his confrontation rights.

 Before *Crawford*, the United States Supreme Court held that in-court descriptions of out-of-court statements, as well as verbatim accounts, are "statements" and can violate the Confrontation Clause.[31] In *Crawford*, the Supreme Court held that the Confrontation Clause applies to "testimonial" out-of-court statements, whether or not they "fall within a firmly rooted hearsay exception."[32] But, "[n]othing in *Crawford* addressed, or undermined, the established principle that in-court testimony could trigger Confrontation Clause concerns by describing, but not quoting, an out-of-court statement that would otherwise come within the Confrontation Clause."[33] Therefore, both before and after *Crawford*, out-of-court remarks admitted into evidence at trial are "statements" for purposes of the Confrontation Clause if, "fairly read, they convey to the jury the substance of an out-of-court, testimonial statement of a witness who does not testify at trial."[34]

Several federal circuit courts have held that in-court testimony which communicates the substance of unavailable witnesses' statements can violate the Confrontation Clause, even when there is no verbatim account of the out-of-court state-

---

**27.** *Crawford v. Washington*, 541 U.S. at 53–54, 124 S.Ct. 1354 (emphasis added).

**28.** *Dixon v. State*, 996 A.2d 1271, 1277–78 (Del.2010) (citing *Davis v. Washington*, 547 U.S. at 822–24, 126 S.Ct. 2266). A "nontestimonial" statement, on the other hand, is made for the purposes of acquiring immediate emergency aid and/or assistance of public safety officials at the scene of the crime. *See id.* at 1278–79.

**29.** *Crawford v. Washington*, 541 U.S. at 53, 124 S.Ct. 1354.

**30.** *Davis v. Washington*, 547 U.S. at 822, 126 S.Ct. 2266.

**31.** *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

**32.** *Crawford v. Washington*, 541 U.S. at 40, 124 S.Ct. 1354 (citation omitted).

**33.** *Ocampo v. Vail*, 649 F.3d 1098, 1108–09 (9th Cir.2011).

**34.** *Id.* at 1110.

ment.[35] In *Favre v. Henderson*,[36] the Fifth Circuit held that the defendant's confrontation rights were violated because "testimony was admitted which led to the clear and logical inference that out-of-court declarants believed and said that [the defendant] was guilty of the crime charged."[37] The Fifth Circuit explained that "[a]lthough the officer never testified to the exact statements made to him by the informers, the nature of the statements . . . was readily inferred."[38]

In *Ryan v. Miller*,[39] the Second Circuit observed that "[t]he relevant question is whether the way the prosecutor solicited the testimony made the source and content of the conversation clear."[40] In *Ryan*, the Second Circuit held that "[i]f the substance of the prohibited testimony is evident even though it was not introduced in the prohibited form, the testimony is still inadmissible" under the Supreme Court's Confrontation Clause precedents.[41] In *Hutchins v. Wainwright*,[42] the Sixth Circuit reached the same conclusion: "[a]lthough the officers' testimony may not have quoted the exact words of the informant, the nature and substance of the statements suggesting there was an eyewitness and what he knew was readily inferred."[43]

In *Ocampo v. Vail*,[44] a detective's in-court testimony conveyed the critical substance of an unavailable witnesses' out-of-court statement, even though that state-

ment was not repeated verbatim. In *Ocampo*, "[t]he prosecutor's closing argument then framed for the jury precisely what they were meant to take from the detective's testimony. . . ."[45] In Wheeler's case, the same thing occurred during the prosecutor's closing argument:

Now, earlier today, this morning, you heard from the chief investigating officer, Detective Ryde; and he told you, again under oath, how he interviewed Shani Scott and Amber Scott. And remember Shani Scott was an eyewitness. She was in the kitchen when the bullets were flying past her and her one year old. Now, we interviewed her in his car within an hour and a half of the shooting after she had calmed down a bit, but clearly everything was still fresh in her mind; how we then interviewed the defendant baby's mom, Amber Scott, who was also in the house, also in his car within—shooting took place around 8:55. He was interviewing her just before 11:00 at night.

. . . .

And finally, Detective Ryde interviewed Mary Zachery who he told you had information regarding the shooting. *All these people provided information; and the only person identified as the shooter of Daemont Wheeler—excuse me. The shooter of Herbie Davis was*

**35.** *See, e.g., United States v. Meises*, 645 F.3d at 21; *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir.2004).

**36.** *Favre v. Henderson*, 464 F.2d 359 (5th Cir. 1972), *cert. denied*, 409 U.S. 942, 93 S.Ct. 235, 34 L.Ed.2d 193 (1972).

**37.** *Id.* at 364.

**38.** *Id.* at 362. *Accord Taylor v. Cain*, 545 F.3d 327 (5th Cir.2008).

**39.** *Ryan v. Miller*, 303 F.3d 231 (2d Cir.2002).

**40.** *Id.* at 250.

**41.** *Id.* at 249.

**42.** *Hutchins v. Wainwright*, 715 F.2d 512 (11th Cir.1983), *cert. denied*, 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984).

**43.** *Id.* at 516.

**44.** *Ocampo v. Vail*, 649 F.3d 1098 (9th Cir. 2011).

**45.** *Id.* at 1113.

*Daemont Wheeler. No information, no other evidence collected pointed to anyone else but that man.* And you are to decide, based upon the evidence that you've heard, based on the testimony of Herbie Scott, Trisha, the detective, the reports—as the trier of facts, you are to conclude if the defendant—if the State has met its burden.

In Wheeler's case, as in *Ocampo*, given the State's characterization of the indirect hearsay testimony from Detective Ryde in its closing arguments,[46] a reasonable juror could have only concluded that each of the three non-testifying witnesses (Shani, Amber, and Mary) identified Wheeler as the person who shot Davis.[47]

In *United States v. Meises*, the Sixth Circuit summarized the important Confrontation Clause issues that are raised in the instant case:

The opportunity to cross-examine the declarant "to tease out the truth," is no less vital when a witness indirectly, but still unmistakably, recounts a co-defendant's out-of-court accusation. The concerns animating the right to confrontation are especially acute when the statement at issue originates from an *ex parte* examination by a law enforcement officer. Hence, if what the jury hears is, in substance, an untested, out-of-court accusation against the defendant, particularly if the inculpatory statement is made to law enforcement authorities, the defendant's Sixth Amendment right to confront the declarant is triggered.[48]

Although the jury in Wheeler's case was not told what the three unavailable witnesses said verbatim, Detective Ryde's testimony conveyed the substance. The clear inference that the State sought to elicit from Detective Ryde was that each witness identified Wheeler as the person who shot Davis. That point was emphasized in the State's opening and closing arguments to the jury. Accordingly, we hold the State violated Wheeler's Sixth Amendment right to confrontation when it introduced into evidence the substance of inadmissible hearsay statements to an investigating police detective.[49]

### Harmless Error

The final issue is whether the error in admitting Detective Ryde's testimony was harmless. The test for harmless error is set forth in *Chapman v. California*,[50] where the United State Supreme Court held that reversal is required if the reviewing court cannot conclude that the error was "harmless beyond a reasonable doubt."[51] In *Sullivan v. Louisiana*,[52] the United States Supreme Court held "[t]he inquiry [under *Chapman*] is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was unattributa-

**46.** The State reemphasized Detective Ryde's testimony in its rebuttal argument.

**47.** *Ocampo v. Vail*, 649 F.3d at 1113. *Accord Hutchins v. Wainwright*, 715 F.2d at 516.

**48.** *United States v. Meises*, 645 F.3d at 21 (internal citations omitted).

**49.** *See Crawford v. Washington*, 541 U.S. at 51–53, 124 S.Ct. 1354; *Davis v. Washington*, 547 U.S. at 822, 126 S.Ct. 2266.

**50.** *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**51.** *Id.* at 24, 87 S.Ct. 824.

**52.** *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

ble to the error." [53]

In *Holmes v. State*,[54] this Court explained that a prejudicial constitutional confrontation violation occurs where the "out-of-court statements were not merely cumulative evidence ... [but] likely a principal factor in [the] conviction." [55] Where that is not the case, the error is harmless.[56] In Wheeler's case, the record reflects that the inadmissible out-of-court statements were cumulative.

Wheeler was well-known to Davis and the eyewitness identification of Wheeler by Davis was compelling. In addition, Davis' recitation of Shani's excited utterance to Amber was properly admitted into evidence. Therefore, the jury knew Shani immediately told Amber that Wheeler shot Davis. Consequently, when Detective Ryde testified that Shani and Amber had identified Wheeler as the perpetrator, that inadmissible hearsay was cumulative to the properly admitted evidence. The statement attributed to Mary was also cumulative. Consequently, in view of Davis' emphatic eyewitness identification of Wheeler as the person who shot him, the record reflects that the error in admitting Detective Ryde's testimony was harmless beyond a reasonable doubt.

### Conclusion

The judgments of the Superior Court are affirmed.

---

53. *Id.* at 279, 113 S.Ct. 2078.

54. *Holmes v. State,* 11 A.3d 227, 2010 WL 5043910 (Del. Dec. 9, 2010).

55. *Id.* at *5 (quoting *Sanabria v. State,* 974 A.2d 107, 120 (Del.2009) (internal quotation marks omitted)).

